**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                            No. CR 03-2274 JB

JOHN GOULD,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant Gould's Motion for New Trial, filed April 10, 2007 (Doc. 345). The Court held a hearing on the motion on October 12, 2007. The primary issue is whether the Court should grant a new trial because the United States committed a Brady violation by not producing the victim's psychiatric evaluation to Defendant John Gould. Because the United States represents that it produced Tampico Verdin-Rendon's psychiatric evaluation to John Gould, and because the evaluation weighs against Verdin-Rendon's credibility as a witness, Gould does not satisfy his burden under rule 33(d) of the Federal Rules of Criminal Procedure of establishing that the United States failed to produce evidence that was materially beneficial to his defense. Thus, the Court will deny his motion.

**FACTUAL BACKGROUND**

At trial, the United States charged that Gould, a former lieutenant of the Dona Ana County Detention Center ("DACDC"), violated the civil rights of Verdin-Rendon, an inmate, by using excessive force on him. Verdin-Rendon is mentally challenged. Apparently both parties were so concerned about Verdin-Rendon's mental problems that neither side called him as a witness as trial. Gould contends that if he had seen Verdin-Rendon's psychiatric evaluation before trial, he might have

called Verdin-Rendon as his witness.

1.      **Verdin-Rendon's Statements About the Incident.**

During the internal-affairs investigation, even though he was shown a photograph of Gould in a Lieutenant's white shirt, Verdin-Rendon did not identify Gould as one of the men who beat him. See Exhibit 3 (bates numbered 4235) ("Verdin Statement") to Defendant Gould's Motion for a New Trial at 6, filed April 10, 2007 (Doc. 345)("Motion").  Verdin-Rendon also admitted that he may not have been handcuffed at the time that he was sprayed with O.C.  See id. (bates numbered 4234).

In a transcribed conversation with the Mexican consulate, Verdin-Rendon stated: "And this is an injustice that has no name.  Even the lieutenant showed indignation, he showed indignation, he told me, 'Verdin could you please tell me what happened yesterday' and I told him.  And he would just shake his head that he was disagreeing with this." See Motion at 6 (quoting Verdin Statement (bates numbered 6006)).

Verdin-Rendon told FBI Agent Brian Russ that Gould had asked Verdin-Rendon who had broken his arm.  See Verdin Statement (bates numbered 5997).  Gould wanted Verdin-Rendon to identify the detention officer who broke his arm.  See Verdin Statement (bates numbered 6011).

Gould represents that Verdin-Rendon told Verdin-Rendon's lawyer, in an unrelated illegal reentry case against him, that Gould did not injure him except to the extent that Gould used the pepper spray.  See Motion at 6.  Verdin-Rendon told Russ that the effects of the pepper spray went away after about forty-five minutes and that co-Defendant Christopher Tagert caused the injury to his eye by kicking him in the eye during transport to the medical unit.  See Verdin Statement (bates numbered 5996).  To the grand jury, Verdin-Rendon stated that nobody kicked him and co-Defendant Van Tyler Fraembs was the only person who hit him in the head.  See Verdin Statement (bates numbered 4086A).

-2-

On June 1, 2003, the Honorable Karen B. Molzen, United States Magistrate Judge, found Verdin-Rendon incompetent to understand the nature of the criminal reentry proceeding pending against him and ordered that he be hospitalized and evaluated to determine his capacity to proceed. See United States v. Verdin-Rendon, No. CR 03-4929M, Order of Commitment for Competency Evaluation, filed June 12, 2003 (Molzen, M.J.)(Doc. 10).  The Competency Evaluation's ("CPE") purpose was to determine whether "Mr. Verdin-Rendon has now a factual as well as a rational understanding of the charges against him, whether he does have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and if he does not have either of these capacities, whether he can attain them in the foreseeable future."  CPE at 4103.  In accordance with that order, Dr. Abraham Fiszbein, M.D., conducted a CPE of Verdin-Rendon on May 22, 2003.  See Order of Commitment for Competency Evaluation at 4102.

  **2. The CPE.**

Dr. Fiszbein wrote the CPE on Verdin-Rendon on May 28, 2003.  See CPE at 4102.  Dr. Fiszbein noted that Verdin-Rendon's long-term recall was "fair."  Id. at 4107.  During Dr. Fiszbein's evaluation, Verdin-Rendon  included his beating at DACDC as one of several "injustices" he had suffered, without describing the beating in any detail.  CPE at 4104.

Verdin-Rendon told Dr. Fiszbein that he had "been beaten up by officers at the [DACDC] causing him to have a dislocated right shoulder and a fracture of his left elbow."  Id.  Dr. Fiszbein also found that Verdin-Rendon believed DACDC officers and Luna County Detention Center officers were conspiring to do "injustice" to him and to "harm him" for "the purpose of making him crazy." Id. at 4108.  At the time of Dr. Fiszbein 's evaluation, Verdin-Rendon feared "that if he was released 'without all of these injustices rectified,' he may commit 'some very serious criminal acts or something terrorist that is so terrible that no one can ever imagine."  Id.

Based on these and other observations, Dr. Fiszbein concluded:

Mr. Verdin-Rendon has now a factual, but not a rational understanding of the charges against him; and he does not have a sufficient present ability to consult with his attorney with a reasonable degree of rational understanding. In my opinion, it is still uncertain whether he can attain either of these capacities in the foreseeable future, even if treated with psychotropic medications.

Id. (emphasis in original). Based on the CPE, Judge Molzen found that Verdin-Rendon was incompetent to stand trial in the illegal reentry case against him. See Response, Exhibit A, Order of Dismissal Without Prejudice, No. CR03-4929M, filed August 26, 2003 (bates-number 4096).

**PROCEDURAL BACKGROUND**

Gould filed his first Notice of Brady Requests on December 24, 2003. See Defendant Gould's Brady Requests, filed December 24, 2003 (Doc 22). Gould's counsel sought psychological documents, including his psychological diagnosis, and documents related to any legal incompetence because of his refusal to take medications. See id. ¶ 9, at 3.

   2. **Relevant Charges.**

On August 25, 2004, Gould was charged in a Superseding Indictment with two counts of violating 18 U.S.C. § 242 (deprivation of rights under color of law) and two counts of violating 18 U.S.C. § 1512(b)(3)(obstruction of justice by writing false reports). See Superceding Indictment, filed August 25, 2004 (Doc. 91). The evidence that is the subject of Gould's motion pertains exclusively to Counts One and Two of the Superseding Indictment. See Government's Opposition to the Defendant Gould's Motion for New Trial at 1, filed May 10, 2007 (Doc. 353)("Response"). Count One charged Gould for his role in the beating of victim Verdin-Rendon at DACDC in Las Cruces, New Mexico. See id. at 1-2. Count Two charged Gould with writing a false report to cover up the beating. See id. at 2-3. Five other DACDC correctional officers pled guilty to crimes related to the assault and cover up alleged in Counts One and Two. See id. at 2.

-4-

3.      **Discovery.**

On December 4, 2003, United States Magistrate Torgerson entered an order governing discovery.  See Order, filed December 4, 2003 (Doc. 13).  Paragraph 6 of that Order directed the United States to make available to Gould: "[B]y the time required by the applicable law all material for which disclosure is mandated by Brady v. Maryland, 373 U.S. 83 (1963), by Giglio v. United States, 405 U.S. 150 (1972), and by the Jencks Act, 18 U.S.C. Section 3500, and Rules 12(i) and 26.2." Id. ¶ 6, at 6.  The United States represents that it produced over 11,000 pages of discovery to Gould, including the statements of every witness that the United States interviewed and the grand jury testimony of every witness who appeared before the grand jury. See Response at 2.

n April 30, 2004, the United States purportedly produced all the documents in its possession relating to Verdin-Rendon's psychological condition and competency.  See Response, Exhibit A at 1, Letter from Kristy Parker to Stephen Aarons (dated April 30, 2004)(with index and documents bates numbered 4093-4114).  The discovery letter provides, in part: "Enclosed, please find the fifth installment of discovery material for the above-referenced case.  An index is attached."  Parker's April 30, 2004 Letter at 1.

According to the index, the discovery material enclosed with the letter consisted of twelve separate documents with pages bates-numbered 4093-4120.  See Parker's April 30, 2004 Letter at 1.  The index lists each of the twelve documents by title and the specific bates-range of each document as follows:

<table>
<tr><td colspan="2" align="center">***U.S. v. Gould et. al.***<br>**DJ #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**<br>**Additional Discovery Produced: 04/29/04**</td></tr>
</table>

| | |
|---|---|
| 4093-4095 | Sealed Ex Parte Motion of the United States re: Verdin's mental health information |
| 4096 | U.S. v. Verdin-Rendon: Order of Dismissal without Prejudice |
| 4097 | U.S. v. Verdin-Rendon: Order re: Sell Hearing |
| 4098-4099 | U.S. v. Verdin-Rendon: Correspondence to Judge Molzen from Dennis Bitz: 04/05/03 |
| 4100-4101 | U.S. v. Verdin-Rendon: Order of Commitment for Competency Evaluation |
| 4102-4109 | Psychiatric Evaluation of Verdin-Rendon: 05/28/03 |
| 4110-4113 | Brief Psychiatric Report of Verdin-Rendon: 05/28/03 |
| 4114 | U.S. v. Verdin-Rendon: Order for Psychological Examination |
| 4115-4116 | FBI Translation of Verdin-Rendon's letter to SA Brian Russ: 03/11/03 |
| 4117-4118 | Copy of Verdin-Rendon's letter to SA Brian Russ |
| 4119 | IA Interview of Ernesto Hernandez: 10/27/02 |
| 4120 | IA Interview of Brian Baker: 10/31/02 |

Ms. Parker's April 30, 2004 letter.  The United States represents: "Among the documents produced, the index references the 'Psychiatric Evaluation of Verdin-Rendon: 05/28/03.'  The document is entitled "Comprehensive Psychological Evaluation ("CPE")."  Response at 3 (quoting Exhibit A, CPE (bates-numbered 4102-4108)).

**4.**   **September 16, 2006 Hearing**.

On September 16, 2006, the counsel for the United States, James Miles Hanisee,[1] an Assistant

_____

[1]The United States changed trial counsel because Ms. Parker was pregnant and her due date was near one of the trial dates.  See Transcript of Hearing at 7:10-20 (Parker)(taken September 26, 2006).

At the September 26, 2006 hearing, Ms. Parker indicated that Mr. Hanisee would be taking over for her, but ultimately two attorneys from the Main Department of Justice, Mark Blumberg and Evan Rice, III, tried the case for the United States.  The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain

United States Attorney for the District of New Mexico  informed the Honorable Robert H. Scott,

United States Magistrate Judge, that the United States had the psychiatric records of Verdin-Rendon,

at a hearing for a motion to set conditions of release as to material witness.  <u>See</u> Clerk's Minutes, filed

September 12, 2006 (Doc. 204).  He also stated that the United States was considering whether to

disclose that information and move the Court to declare Verdin-Rendon incompetent to testify at trial.

<u>See</u> Motion ¶ 2, at 1.  Apparently this counsel for the United States did not know about Ms. Parker's

letter and disclosures, in any case, the United States did not file that motion.

     **5.**       **<u>The Deposition</u>.**

     The United States arranged for Gould to take Verdin-Rendon's deposition on September 27,

2006.  <u>See</u> Response at 4.   Gould's counsel, Mr. Stephen D. Aarons, was present at the deposition.

<u>See id.</u>  The United States characterizes Verdin-Rendon as difficult to manage and noted that he

refused to answer any questions from Mr. Aarons.   <u>See id.</u>  Gould states that Mr. Aarons, "attempted

to videotape a statement from Inmate Verdin in the presence of Verdin's appointed counsel and

counsel of record.  However, Verdin refused to answer any questions posed . . . .  Counsel was

informed that Verdin only wished to speak to Agent Russ about such matters based on their

longstanding relationship."  Motion ¶ 3, at 1-2.

     **6.**       **<u>Discovery Dispute</u>.**

     On February 16, 2007, Gould's counsel identified in an electronic mail certain bates-ranges

of documents that he asserted he did not possess and transmitted the e-mail to the United States'

counsel.  <u>See</u> Motion, Exhibit 1, e-mail from Stephen D. Aarons to Mark Blumberg (dated February

16, 2007).  Assuming every page was consecutively numbered, Gould's counsel noted that he had

---

slightly different page and/or line numbers.

yet to receive approximately 3,431 pages of Bates' stamped pages from the United States.  See Motion ¶ 4, at 2.  Gould represents: "Among the allegedly undisclosed pages were any Bates stamped pages within a forty-three number series beginning with 4078 and ending with 4120, inclusive." Id.  The CPE, which is bates-numbered 4102-4109, falls within one of the bates-ranges counsel contended he was missing.  See Mr. Aarons' February 16, 2007 e-mail.  Gould's counsel did not, however, specifically request psychological documents in the e-mail.  See id.

The United States reviewed its discovery disclosures, determined it had complied with its obligations, and informed Gould of that fact in a letter dated February 28, 2007.  See Motion, Exhibit 2, Letter from Mark Blumberg to Stephen Aarons at 1 (dated February 28, 2007)("Mr. Blumberg's February 28, 2007 letter").  On February 28, 2007, the United States' counsel, Mr. Mark Blumberg, wrote: "In sum, despite the gap in numbering that you see, the government has fully complied with all of its obligations."  Mr. Blumberg's February 28, 2007 letter at 1.

### 7.      The Motion in Limine.

On March 2, 2007, the United States filed its Motion in Limine to Exclude Evidence.  See United States' Motion in Limine to Exclude Evidence, filed March 2, 2007 (Doc. 245)("Motion in Limine").  In that motion, the United States sought to exclude reference to several categories of evidence, including "psychological findings or diagnosis of victim Verdin."  Motion in Limine at 9.  The Motion in Limine referred to the CPE and explained that the "report, which has been provided to defendants in discovery, concluded that Verdin had a factual but not a rational understanding of the charges against him . . . ."  Id.

Specifically, the United States moved under rule 403 of the Federal Rules of Evidence to exclude reference by Gould to Verdin-Rendon's psychological evaluations.  See id. at 11.  In his response to that motion, Gould did not contest that the United States had produced the psychological

materials.  <u>See</u> Defendant Gould's Response in Opposition to United States' Motion in Limine to Exclude Evidence at 5, filed March 7, 2007 (Doc. 253).

The Court held a hearing on the United States' motion in limine on March 8, 2007.  <u>See</u> Transcript of Hearing (taken March 8, 2007)("Tr.").  Gould noted that he did not know much about Verdin-Rendon's background.  <u>See</u> Tr. at 142:24-25 (Aarons).

**8.  <u>Gould's Second Notice of Brady Requests and Motion to Dismiss for Brady Violations.</u>**

On March 14, 2007, Gould filed his Second Notice of Brady Requests.  <u>See</u> Defendant John Gould's Second Notice of Brady Requests ¶ 9, at 3, filed March 14, 2007 (Doc. 267).  The Second Notice listed Verdin-Rendon's psychological records among a host of other material that Gould asserted that he had not received.  <u>See id.</u>  Gould also filed a motion to dismiss for <u>Brady</u> violations. <u>See</u> Defendant Gould's Motion to Dismiss for Brady Violations, filed March 14, 2007 (Doc. 270). In that motion, Gould argued that he had not received the material listed in his Second Notice of Brady Requests.  <u>See id.</u> ¶ 2, at 1.

At the hearing Gould noted that on March 20, 2006, the United States "started talking about the psychiatric condition of one of the inmates."  Trial Transcript (taken March 21, 2006)("March 21 Tr.") at 19:3-4 (Aarons).  The Court asked the United States if it intended to refer in the opening to that condition.  <u>See id.</u> at 19:6 (Court). The United States responded that  am going to mention that Tampico was slow, because the witnesses will testify to that.  That's all I will say about Tampico Verdin."  <u>Id.</u> at 19:7-9 (Blumberg).  Gould then represented that the United States had not disclosed a photo array shown to Verdin.  <u>See id.</u> at 21:17-21 (Aarons & Blumberg).   United States' counsel stated:  "I have not seen them.  Identity was not an issue, so frankly I have never seen the photo arrays."  <u>Id.</u> at 21:22-23 (Blumberg).  Gould then noted that he had identified them as <u>Brady</u> material.

-9-

See id. at 21:24-25 (Aarons).  The United States counsel stated: "Your Honor, to make sure that

there's no misrepresentations.  It will be fast.  The agent has provided me a copy of the New Mexico

state -- excuse me, the Internal Affairs investigation conducted by Tony Acosta. In it, there are some

pictures.  It is not clear how they

were used or why they were used, but what it has is pictures of people in the Detention Center,

officers." Id. at 23:1-7 (Blumberg).  The Court asked Mr. Blumberg if that report had been produced.

See id. at 23:8 (Court).  Mr. Blumberg responded "It was produced years ago."  Id. at 23:9

(Blumberg).

        After a hearing on the motion to dismiss, the Court issued an order, on April 6, 2007,

dismissing the motion as moot.  See Order, filed April 6, 2007 (Doc. 343).  In the order, the Court

noted that the "United States represented that it has either satisfied or does not possess the items Mr.

Gould requests"  Order at 1.  The Court found "that the United States' production to date moots all

of the issues John Gould's motion raised, or that the United States does not have possession of the

requested information," and dismissed Defendant Gould's motion. Id.

        **9.        Court's Order on the Motion in Limine.**

        On March 17, 2007, the Court issued an order on the United States' motion in limine.  The

Court stated:

> The Court excludes reference to the psychological findings and diagnosis made for
> Verdin.  The Court believes that this evidence is substantially more prejudicial than
> probative, see Fed. R. Evid. 403, 608, and it appears that Mr. Gould did not have
> knowledge of the findings or diagnosis before the occurrence of the alleged incident.

Order at 4, filed March 17, 2007 (Doc. 284).  The Court's concern was that if Gould did not know

about the evidence, or what was in it, it did not help the factfinder determine scienter.  The Court

excluded reference to the CPE because it was prejudicial.  See id.

10.    **Trial**.

Before opening statement, Gould's counsel lodged an objection outside the jury's presence:

> The Court excluded reference to those [psychiatric] findings and diagnoses in Order 284. We have not been given the medicals. The government [is] privy to them, and we talked about them in front of the court. There was an issue about Mr. Verdin in [his] release pretrial in the material witness warrant, but that's somewhat part and parcel of the motion to dismiss.

Trial Transcript at 19:13-19  (taken March 21, 2007)("March 21 Trial Tr.")(Aarons).  The United States responded that: "As relates to Tampico Verdin each, I believe, of the correctional officers who were present and participated in the beating of Tampico had prior occasions with him and knew he was what they call slow.  It describes why he was not aggressive at the time of the entry into the rule as Mr. Gould's report indicated to the contrary.  All they will say is yeah, he operated in child-like behavior, didn't communicate well, he is kind of slow."  March 21 Trial. Tr. at 19:25-20:4 (Blumberg).  Mr. Aarons responded: "That's not what he thought he would say."  Id. at 20:6-7 (Aarons).  The Court stated: "Is that all right?"  Id. at 20:8 (Court).  Mr. Aarons replied "That's all right."  Id. at 20:9 (Aarons).  And because Gould could not state whether he intended to call Verdin-Rendon as his witness at trial, the Court excluded a slide from the PowerPoint presentation that Gould intended to use in his  opening statement with the quotation  that Verdin-Rendon made to the Mexican consulate as hearsay.  See id. at 59:4-7 (Court).

In the United States' opening statement, Mr. Blumberg told the jury: "By all accounts [Verdin-Redon is] a bit slow, described as child-like, not functioning at a fully adult level."  March 21 Trial Tr. at 28:20-21 (Blumberg).

During the trial, on March 30, 2007, the United States' counsel represented in open court that it had produced the documents relating to Verdin-Rendon's competency evaluations, specifically referencing bates-numbers 4093-4114.  See Trial Transcript  at 17:17-22 (taken March 30, 2007)

("March 30 Trial Tr.").

> MR. BLUMBERG: One important evidentiary or discovery matter I want to take care of right now.  There's been some discussion about not turning over competency evals of Tampico Verdin and those were turned over with [Bates stamp nos.] 4093-4114, and I clearly remember after the discussion with co-counsel this morning they had been turned over and that's the reason we filed the motions in limine to exclude reference to the detail and the health evaluations so I want to make sure there's no issue the government has not turned over anything that could remotely be within its Rule 16 responsibilities.

March 30 Trial Tr. at 17:17-18:2 (Blumberg).  Gould did not contest the United States' representation.  See id. at 18:3 (Aarons).  Specifically, Gould did not make the argument that he makes here and assert that pages 4078-4120 were missing.

During his opening statement and his examination of DACDC Internal Affairs Investigator Alexander Acosta, Gould advanced the defense that Verdin-Rendon did not identify Gould as one of his assailants.  See March 21 Trial Tr. at 58:11-12 (Aarons); id. at 286:7-19 (Aarons).  Later in the trial, Gould's counsel elicited from Russ that Verdin-Rendon was apparently shown a photograph of Gould but did not identify that photograph as one of the correctional officers who had struck him.  On cross-examination, the prosecutor asked:

> Q.    Based on that interview alone, it's true that Tampico Verdin made a whole host of identification.
>
> A.    Yes, he did.
>
> Q.    Many of which were absolutely impossible under the facts to have actually been true, correct?
>
> A.    Yes.
>
> * * * *
>
> Q.    In fact, you also learned in the course of your investigation that Tampico has mental health issues, right?
>
> A.    Yes I have.

* * * *

Q.   Does that give you an occasion of how reliable Tampico Verdin's recollections were?

A.   Gives me an indication that Mr. Verdin's recollection wasn't reliable and he didn't know completely.

Vol. 7 Trial Transcript at 44:11-45:22 (taken March 28, 2007)("March 28 Trial Tr.")(Blumberg & Russ).

The United States did not call Verdin-Rendon as a witness. While Gould's counsel informed the Court that Gould intended to call Verdin-Rendon as a witness at trial, see March 21 Tr. at 60:3-4 (Aarons), Gould's counsel elected not to call Verdin-Rendon at trial. In closing argument, the United States twice chastised Gould for not calling Verdin-Rendon or any of the other forty-five witnesses regarding his beating: "Defense made reference to the 45 people who came in the cell afterwards. They didn't call one of those people. Every witness who saw what was happening in the Tampico Verdin incident saw there was a beating going on, and John Gould joined them." March 30 Trial Tr. at 84:25-85:4 (Rice).

Gould was convicted at trial on all counts against him. See Verdict, filed April 2, 2007 (Doc. 337). With respect to Counts One and Two, the evidence established that five correctional officers began beating Verdin-Rendon without provocation when he refused to move from his cell, that Gould responded to the cell and joined in the assault, and that Gould wrote a false incident report to cover up the beating. See Indictment at 1-3, filed November 13, 2003 (Doc. 1).

**10.     Rule 33(a) Motion.**

Gould filed his motion for a new trial on April 10, 2007. See Motion at 1. The United States contends that Gould's motion for a new trial pertains only to Counts I and II of the Superseding

-13-

Indictment, which concern the assault of Verdin-Rendon and Gould's subsequent obstruction of justice.  See Response at 1.  Gould contends that the Court should overturn the jury verdict and grant a new trial under rule 33(a) because the United States failed to produce the psychiatric evaluation of Verdin-Rendon, the victim of Count I of the Superseding Indictment.  See Response at 1-2.  Gould filed his motion for a new trial on April 10, 2007.  See Motion at 1.

Gould contends that he elected not to call Verdin-Rendon at trial as a witness "in large part because of the uncertainty of his psychiatric condition and its effect on his competency to testify and his ability to remember."  Id. ¶ 13, at 5.  Gould contends that his "[c]ounsel was not given access to psychiatric records discussing Verdin's competency to testify, ways to resolve issues regarding his refusal to cooperate during questioning, and untold insight which would have weighed into [his] counsel's precarious decision whether to call [Verdin-Rendon] to the stand."  Id.  Gould contends that his counsel's decision "was made even more precarious by the [United States'] violation of [his] constitutional right to have access to the information within [the United States'] possession."  Id.

Gould contends that "[t]here is no dispute that the psychological evidence constitutes Brady material."  Id. ¶ 21, at 8.  Gould grounds his motion for a new trial on newly discovered evidence. See id. ¶ 23, at 9.  Gould contends that he sought the material with due diligence.  See id. ¶ 29-33, at 11-12.  Gould argues that the he would have used the material to elicit competent testimony from Verdin-Rendon favorable to him during trial, not to impeach Verdin-Rendon.  See id. ¶ 34, at 12. Gould contends that the allegedly withheld evidence was material to the central issue of the victim's ability to perceive, remember, and communicate what happened to him inside the cell, and is material to the contested issue whether Gould knowingly involved himself in a wrongful battery.  See id. ¶ 35-37, at 12-13.  Lastly, Gould contends that the Verdin-Rendon material would have probably produced his acquittal because four of his co-defendants entered into plea agreements and afterwards

-14-

"radically altered their pre-trial statements about [his] participation." Id. ¶ 42, at 14-15. Gould contends that "the only inculpatory eyewitnesses were co-defendants." Id. ¶ 46, at 15-16 (emphasis in original).

The United States filed a response to Gould's motion for a new trial on May 10, 2007. See Response. The United States contends that the CPE undermines Verdin-Rendon's credibility as a witness. See Response at 4. The United States contends that Gould has not demonstrated that it suppressed any evidence about Verdin-Rendon's mental state or that any such evidence would be material to the outcome of his trial. See id. at 6. The United States represents that it provided Gould with "extraordinary pre-trial discovery" because it gave Gould "virtually unlimited access to all evidentiary materials in its files, including statements covered by the Jencks Act, years in advance of the 2007 trial." Id. at 7. The United States argues that it "ensured that Verdin-Rendon would be available to the defense by seeking a material witness warrant and by arranging for [Gould] to take Verdin-Rendon's Rule 15 deposition." Id. at 7 n.2.

The United States argues that "Defendant Gould simply cannot establish that he would have called Verdin as a witness if he knew the contents of the psychological documents." Id. at 8. The United States notes that, when Gould attempted to take Verdin-Rendon's deposition on September 29, 2006, "Verdin-Rendon was virtually noncommunicative and refused to answer questions from Defendant Gould's counsel. Based on this encounter, Defendant Gould had far more insight into how Verdin-Rendon was likely to testify in February 2007 then he could have obtained from written reports created in 2003." Id. at 8-9. The United States argues that, because Gould "never made any effort to compel Verdin-Rendon's testimony, or to have this Court undertake a competency evaluation," Gould's observations at the deposition of Verdin-Rendon "convinced him not to call Verdin-Rendon as a witness as trial." Id. at 9. The United States contends that the CPE undermines

Gould's ability to call Verdin-Rendon as a defense witness. See id. at 9. The United States also notes that Gould was able to advance the defense that Verdin-Rendon did not identify Gould as one of his assailants. See id. (citing Exhibit C, Trial Transcript (taken March 21, 2007)("March 21 Trial Tr.") at 58:11-12; Exhibit D, Trial Transcript (taken March 27, 2007)("March 27 Trial Tr.") at 286:7-19). The United States contends that Gould's ability to call Verdin-Rendon to assert defenses depends on Verdin-Rendon's credibility as a witness. See Response at 9. "The CPE makes Verdin-Rendon a less credible witness, not a more credible one." Id. (emphasis in the original).

On October 11, 2007, a hearing was scheduled on this matter but was continued because Gould was not present. See Transcript of Hearing (taken October 11, 2007) at 2:3-9 (Aarons & Court);[2] id. at 6:24-25 (Court). On October 12, 2007, the Court held a hearing on this matter. See Transcript of Hearing (taken October 12, 2007)("Tr."). Gould called his private investigator, Troy Garrity, to testify. See id. at 2:18-25 (Aarons & Court); Clerk's Minutes, filed October 19, 2007 (Doc. 390).

Garrity testified that the discovery materials in Gould's case came to Gould's counsel via the United States mail. See Tr. at 4:10-12 (Aarons & Garrity). Garrity stated that they would normally go through the discovery, and study, read, scan, and then file it. See id. at 4:14-16 (Garrity). Garrity noted that the discovery was Bates-stamped. See id. at 4:17-19 (Aarons & Garrity). Garrity noted that they scanned the discovery using Adobe PDF, and then would use that software to access the documents. See id. at 4:20-23 (Aarons & Garrity).

Garrity testified that, as trial approached, they "began organizing the discovery by using the bates stamp system. It's a numerical system which has a sequence, so we began dividing up the

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

documents into groups of 500, because that's what would fit the folders and files, and started from 00 on up to the ending number to see if they are all in sequence and line up." Id. at 5:2-7 (Garrity). Garrity noted that they "uncovered several gaps in the sequence where [they] ha[d] missing documents." Id. at 5:9-10 (Garrity).  Garrity testified that they kept the original discovery, had a working copy, and a scanned copy, and after examining those three copies they "still had the missing gap -- the gaps so to speak." Id. at 5:13-15 (Garrity).

Garrity testified that they were missing the pages noted in Mr. Aaron's February 16, 2007 e-mail.  See id. at 5:22-6:24 (Aarons & Garrity).  Garrity testified that, after the discussion on March 30, 2007 outside the presence of the jury about Gould's concern regarding discovery pages (bates numbered 4093-4114), Mr. Aarons directed Garrity to "find [those discovery pages] and search again in the discovery boxes that we did have present at trial, numerous occasions that [Mr. Aarons] would ask [Garrity] to look for these documents and this report.  And from [Garrity and Mr. Aarons'] understanding it was to be located in that sequence of numbers and it just was not there." Tr. at 9:2-18 (Aarons & Garrity).

Garrity testified that the psychological evaluation for Verdin-Rendon was never found during Gould's trial.  See Tr. at 9:19-21 (Aaron & Garrity).  Garrity testified that he was working on at least ten cases during the time of the Gould trial.  See id. at 11:8-15 (Rice & Garrity).  Garrity testified that he never saw the inventory sheet Ms. Parker mailed to Mr. Aaron.  See id. at 12:21-13:4 (Court & Garrity).

Garrity also testified, however, that, since Gould filed his motion for a new trial, he has not gone back through the files to see if Ms. Parker's April 30, 2004 letter was in the files.  See Tr. at 13:5-9 (Court & Garrity).  Furthermore, Garrity did not know if anyone from Mr. Aaron's office or Garrity's office has gone through the Gould files to see if Ms. Parker's April 30, 2004 letter was in

the correspondence.  See Tr. at 13:10-14 (Court & Garrity).  Garrity testified, however,  that it was

not possible that Ms. Parker's April 30, 2004 letter would be in a different file than in the Gould files.

See Tr. at 14:7-15:8 (Court & Garrity).  "[W]e did have phases where we thought we [might] not be

going to trial, but we do keep the entire discovery in one -- in one area, and that's how we know it

to be [missing].  We don't really have it divided up.  We have a control file when things come in

before they actually get filed in the appropriate files that we did keep things there."  Tr. at 15:3-8

(Garrity).

　　　　Gould conceded that Ms. Parker's April 30, 2004 letter was written on or about April 30,

2004.  See Tr. at 18:6-11 (Court & Aarons).  Gould suggested, however, that "[t]here are some facts

that . . . it may not have been mailed."  Tr. at 18:12 (Aarons).  Mr. Aarons represented that he had

a conversation in October 2006 with Assistant United States Attorney Miles Hanisee that Mr.

Hanisee told him that the Verdin-Rendon's psychological evaluation should have been disclosed to

Gould.  See Tr. at 18:17-24 (Aarons).

　　　　Gould conceded that part of his defense was that Verdin-Rendon "was slow," but maintained

that the psychological records demonstrated that the United States had great insight into Verdin-

Rendon.  Tr. at 23:8-18 (Court & Aarons).  Gould stated that he complained about the nondisclosure

of Verdin-Rendon's psychological materials  in his response to the United States' motion in limine

and repeatedly at trial.  See  Tr. at 26:5-11 (Aarons).  Gould conceded, however, that he does not

know how he would have used the Verdin-Rendon materials:

> COURT:　　　　　　　[Y]ou made this representation that you did not seek the
> information to embarrass or to impeach, so it was solely for
> your personal evaluation of whether to put the witness on the
> stand.  Correct?
>
> MR. AARONS:　　　　I don't know how I would have used it.  I know some things
> that for sure I didn't -- as I look at it now with [hindsight],

would I see that information was being highly favorable to the defense.  And I guess I'm agreeing with you, because our purpose . . . had we called him . . . would not have been to say[:] ["Y]ou're a slow person or you don't know what you're talking about.["] In fact, what we wanted to establish, if we had a little better insight into [Verdin-Rendon], was that he never saw John Gould do anything other than spray pepper on him, but we were [handcuffed] in a number of ways, and the Government knew -- should have known we were handcuffed. We were handcuffed because . . . he didn't want to talk to us. This [psychological report] is a roadmap of how to talk to [Verdin-Rendon].  [That] person was able to get him to open up.  All he did was talk about soccer, which was Verdin[-Rendon's] favorite subject and talked about Central America briefly with him, and certainly we could have gotten someone who is a [Spanish] speaker to talk to him and get him feeling comfortable in the process.  But I didn't have access to that.

Tr. at 27:23-28:4-23 (Court & Aarons). Gould contended that, while the psychological evaluation showed Verdin-Rendon was "slow," it also showed "that he is capable of giving a great deal of data." Tr. at 28:24-29:1.  Gould represented that he would have "[d]efinately" called Verdin-Rendon if he would have had access to the psychological evaluation.  Tr. at 29:14-18 (Court & Aarons).  Gould argued that the reason he did not put Verdin-Rendon on the stand was "because he was such an[ ] unknown."  Tr. at 31:16 (Aarons).  Gould contended that the suppression of Verdin-Rendon's psychological evaluation deprived him of the knowledge that Verdin-Rendon had "the ability to communicate."  Tr. at 33:11 (Aarons).

Gould argued that, even if Verdin-Rendon was found incompetent to stand trial, he still may have been competent to testify, because Verdin-Rendon could perceive the event and know how to tell the truth, and Verdin-Rendon "certainly ha[d] a lot of perceptions that [he was] capable of describing in some detail."  Tr. at 44:17-20 (Court & Aarons).  Gould argued that the United States is in the unique position of knowing what the missing pages were and that he could not have requested the Verdin-Rendon psychological reports any more than he already did in his discovery

requests, his response to the United States' motion in limine, and his discussions off the record.  See Tr. at 55:6-10 (Aarons).

Gould raised another Brady argument regarding the Acosta tapes.  See Tr. at 36:17 (Aarons). There were some tapes made by Tony Acosta during his interviews of everyone involved in the incident that were apparently destroyed by county officials.  Gould conceded that he had not raised the Acosta tapes as part of his New Trial Motion.  See Tr. at 36:20-22 (Court & Aarons).   Gould contended that confidence in his verdict is undermined, because the United States has not explained why it refused to disclose the Verdin-Rendon psychological reports and the Acosta tapes.  See Tr. at 55:22-25 (Aarons).

The United States conceded that the Verdin-Rendon psychological reports are Brady material. See Tr. at 47:4-8 (Court & Rice).  The United States stated that the purpose of Mr. Blumberg's February 28, 2007 letter was to tell Gould that he got the discovery to which he was entitled under rule 16.  See Tr. at 47:19-20 (Rice).  The United States noted that it reviewed its discovery, made certain  it had complied with its obligation, and then informed Gould of its compliance in that letter. See Tr. at 48:2-6 (Rice).

The United States contended that Gould never specifically asked for Verdin-Rendon's psychological reports until after the trial started.  See Tr. at 48:16-20 (Rice & Court).  The United States represented that, when the psychological reports were brought up during the trial on March 30, 2007, outside the presence of the jury, it did not give Gould another copy of Verdin-Rendon's psychological evaluation because he did not ask for it.  See Tr. at 49:18-50:2 (Court & Rice).  The United States acknowledged that it has no way to establish that Ms. Parker's April 30, 2004 letter was mailed.  See Tr. at 50:5-17 (Court & Rice).

The United States argued that Gould's materiality argument is undermined because he never

made a specific request for the Verdin-Rendon psychological reports and had substantial opportunity

to request them.  See Tr. at 54:8-14 (Rice). The United States noted that Gould did not brief the Brady

issue regarding the Acosta tapes.  See Tr. at  52:24-53:1 (Court & Rice).

## RULE 33

Rule 33 provides:

(a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) Time to File.

(1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

(2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33.  Any motion for a new trial grounded on newly discovered evidence is timely

if filed within three years after the verdict.  See Fed. R. Crim. P. 33(b)(1).  Under rule 33, the district

court has discretion to grant a new trial if the interests of justice require one.  Ordinarily, a district

court's denial of a motion for a new trial is reviewed for abuse of discretion.

## LAW REGARDING MOTIONS FOR NEW TRIAL BASED ON ALLEGED BRADY VIOLATIONS

When the United States withholds evidence on demand of a defendant that, if made available,

would tend to exculpate him, such suppression of evidence can violate the defendant's due process

rights.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Upon the defendant's motion, the court may

vacate any judgment and grant a new trial if the interest of justice so requires.  See Fed. R. Crim. P.

33(a).  Motions for new trials are, however disfavored, and "should only be granted with great caution."  United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999)(reversing district court's grant of a new trial motion based in part on alleged Brady violations), cert. denied, 529 U.S. 1029 (2000).

A defendant seeking a new trial based on an alleged Brady violation has the burden to demonstrate that: "[i] the prosecution suppressed evidence, [ii] the evidence was favorable to the defendant, and [iii] the evidence was material."  United States v. Velarde, 485 F.3d 553, 558 (10th Cir. 2007). "Evaluation of a Brady claim asserted in a motion for a new trial involves an application of [those] three elements . . . and not the five-prong . . . test utilized in typical newly discovered evidence claims." United States v. Quintanilla, 193 F.3d at 1149 n.10.  The Constitution does not "demand an open file policy." Id. at 437.  "While an open file policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue." Smith v. Secretary Dep't of Corr., 50 F.3d at 828 (internal quotations omitted).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more.  But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Smith v. Secretary Dep't of Corr., 50 F.3d at 828 (internal citations omitted).

The United States' good faith or bad faith is irrelevant.  See Brady v. Maryland, 373 U.S. at 87.  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.  The United States has

an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial."  Id. at 433 (internal quotations omitted).  On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Secretary Dep't of Corr., 50 F.3d at 823.

### A.   SUPPRESSION.

As the United States Court of Appeals for the Tenth Circuit explained in Smith v. Secretary Dep't of Corr., "while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a Brady claim, such proof is by no means necessary."  50 F.3d at 824.  In United States v. Hernandez-Muniz, 170 F.3d 1007 (10th Cir. 1999), the Tenth Circuit found that the United States did not suppress information when it did not provide the defendant with his own statement made to an agent, but instead provided the defendant with the agent's statements made at a preliminary hearing, because the defendant's trial counsel attended that hearing, cross-examined the agent, and the transcripts of the preliminary hearing testimony were made available to the defendant.  See id. at 1010.  The Tenth Circuit held that the United States did not suppress the defendant's statement, because it "provided the allegedly exculpatory information at the preliminary hearing" and "due process does not necessarily require disclosure in a specific form or manner."  Id. at 1011.

In United States v. Riley, 657 F.2d 1377 (8th Cir. 1981), the United States Court of Appeals for the Eighth Circuit held that there was no Brady violation by the United States failing to produce psychiatric records of a victim to the defendant.  See id. at 1386-87.  There was no evidence that the United States had possession or control of the records regarding psychological counseling, alcohol

and drug abuse, and a psychiatric in-patient hospitalization.  See id.  The Eighth Circuit disagreed

with the defendant's contention that he was restricted in cross-examination, because the defendant

put before the jury the victim's "psychological and behavior problems, drug and alcohol abuse,

hospitalization, lack of memory, inconsistent testimony, and racial bias." Id. at 1387.  See United

States v. Pellot, 43 Fed.Appx. 473, 475 (3d Cir. 2002)(holding that there was no Brady violation

when the United States produced information regarding a witness' psychological problems shortly

before the trial began, or on the day the United States opened its case, because the judge took

appropriate steps to ensure the belated disclosure did not prejudice the defendants by conducting a

hearing on the witness' competency, allowed the defendants to have an expert examine her, adjourned

the trial for a day to allow the defense to further investigate, and the defense vigorously cross-

examined the witness on her history as a patient in a mental hospital); United States v. Burns, 668

F.2d 855, 859-60 (5th Cir. 1982)(holding that there was no Brady violation because there was no

evidence that the United States suppressed further psychological evidence regarding a witness, any

psychological evidence that existed was impeachment evidence, the witness' seeking of psychiatric

help was not material because it would have been inadmissible under rules 403 and 608(b) of the

Federal Rules of Evidence, and the United States had a strong case against the defendant even absent

the witness' testimony); Freeman v. United States, 284 F.Supp.2d 217, 226-27 (D.Mass.

2003)(holding that the United States did not suppress evidence consisting of a letter from its key

witness' psychiatrist regarding her doubtful ability to testify given her mental condition because there

was a presumption that a letter properly stamped, addressed, and delivered reached the United States

Attorneys' Office, but because of some clerical error, the United States never possessed or knew of

the letter); Rivera v. United States, 494 F.Supp.2d 383, 386 n.7 (E.D.Va. 2007)(holding that there

was no Brady violation when the defendant did not receive a psychological evaluation of a witness

where the United States provided with the defendant with essentially the same information contained in the evaluation in a different form, and the report simply restated information that was already well-known the to defendant at the time of trial).  But see United States v. Gray, 52 Fed.Appx. 945, 947 (9th Cir. 2002)(holding that medical records of the alleged victim containing extensive impeaching evidence  were suppressed although they were delivered to the defense the Friday before the witnesses were presented because they were too late for the defense to arrange for "health service providers in three states to be present  .  .  . for a trial involving one of their patients.").

### B.    FAVORABILITY.

The evidence is question must be exculpatory or favorable to the defendant.  See Smith v. Secretary Dep't of Corr., 50 F.3d at 825; United States v. Gray, 52 Fed.Appx. 945, 947 (9th Cir. 2002)(holding that medical records of the alleged victim containing extensive impeaching evidence bearing on the her ability and inclination to accurately and truthfully perceive, remember and relate what occurred were favorable to the defendant because they were impeachment material).  "It is precisely because defense counsel does not, and cannot, know what potentially exculpatory evidence the prosecutor possesses that there cannot realistically be any meaningful distinction between the prosecutor's obligation under Brady in a general request case and its obligation in a no request case." Smith v. Secretary Dep't of Corr., 50 F.3d at 826-27.  The prosecution has an obligation to disclose obviously exculpatory evidence whether the defense has requested it or not.  See id. at 827.

### C.    MATERIALITY.

"To make the materiality determination, [the court] view[s] the evidence's significance in relation to the record as a whole."  United States v. Hughes, 33 F.3d 1248, 1252 (10th Cir. 1994). Evidence is "material" for purposes of granting a new trial on an alleged Brady violation "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." United States v. Velarde, 485 F.3d at 559 (quotations and citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quotations and citations omitted).

In evaluating materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). The Tenth Circuit notes that:

> Under this more flexible, sliding scale approach to assessing the materiality vel non of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation. As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation. Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a Brady violation.

Smith v. Secretary Dep't of Corr., 50 F.3d at 827. Failure to disclose a specifically requested report is "seldom, if ever excusable." Id. at 830 (internal quotations omitted). "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant." Scott v. Mullin, 303 F.3d 1222, 1230-31 (10th Cir. 2002)(internal quotations omitted).

In Coleman v. Saffle, 912 F.2d 1217 (10th Cir. 1990), the Tenth Circuit considered whether medical records of a state hospital that conducted the defendant's mental competency evaluation were material. See 912 F.2d at 1217. Upon request of the defendant's counsel, a competency evaluation was done on the defendant. See id. at 1220. A letter from the state hospital's chief forensic psychiatrist reported that the defendant was competent. See id. The detailed medical records and evaluations were not given to the judge or counsel. See id. The Tenth Circuit determined whether

those records and evaluations were material in "the context of the complete record." Id. at 1222.  The

Tenth Circuit noted that there were several factors unfavorable to the defendant's position in that the

records and evaluations demonstrated his mental illness.  See id. These statements included that the

defendant's schizophrenia was "in partial remission, if not complete," and that the psychiatrist

concluded that the defendant was "competent in a psychiatric and legal point of view . . . ."  Id.

(internal quotations omitted). The Tenth Circuit noted that the records "contained some damaging

statements of a different sort, unfavorable to petitioner if presented to the jury." Id. The unfavorable

information included descriptions of the defendant's dangerousness.  See id.  "Such unfavorable

evidence from the medical records would have added force to the damaging evidence of [the

defendant's] violent conduct."  Id.  The Tenth Circuit concluded that

> even if the medical records had been disclosed and used as favorable evidence as to
> [the defendant's] mental condition to argue sympathetically for him at the sentencing
> stage, nevertheless there was no reasonable probability that, had the evidence been
> disclosed to the defense, the result of the proceeding would have been different and
> there was no such probability sufficient to undermine confidence in the outcome.

Id. at 1223 (internal quotations omitted).

In United States v. McMahon, 715 F.2d 498 (11th Cir. 1983), the defendants contended that

the United States' failure to produce psychiatric reports regarding the United States' key witness to

them was in violation of Brady.  See id. at 501.  The United States Court of Appeals for the Eleventh

Circuit noted that the United States did not have copies of the reports in its case files and the trial

judge decided to proceed to trial rather than wait until the defendants obtained copies of the reports.

See id.  The Eleventh Circuit stated that, even assuming that the reports were favorable, they would

not have been material, because the defendants "had an ample opportunity to attack the credibility

of [the witness'] testimony, and there [was] no indication in the record that this attack would have

been strengthened if [the defendants] had been given copies of the psychiatric reports they sought."

Id. The Eleventh Circuit noted that the defendants did not exercise reasonable diligence because they could have contacted the doctors who prepared the reports, obtained any relevant information, or called the doctors as witnesses.  See id.

In Wilson v. Mitchell, 498 F.3d 491 (6th Cir. 2007), the United States Court of Appeals for the Sixth Circuit rejected the defendant's contention that the prosecution's failure to disclose the defendant's records from the Ohio Department of Youth Services was a Brady violation.  See id. at 512-13.   The defendant contended that the records were material because the defendant's psychological expert needed to use them in the mitigation phase of the trial to prepare for the defendant's psychological evaluation and mental-health assessment. See id. at 512. The Sixth Circuit rejected the defendant's contention that the expert's testimony was unprepared and incompetent without the use of the records.  See id.  The Sixth Circuit explained that even if the prosecution had suppressed the records despite the defendant's requests, the defendant did not demonstrate that the records were material, because he could not demonstrate that timely disclosure would have altered the outcome of the proceeding.  See id. at 513.  The expert's testimony indicated that he agreed with most of the undisclosed records and therefore the defendant could not establish how the expert's testimony would have been different if the records had been disclosed earlier, nor how disclosure would have altered the outcome of the penalty phase.  See United States v. Pineda, 165 Fed.Appx. 772, 775 (11th Cir. 2006)(affirming the trial court's denial of the defendant's request for a new trial based upon a psychologist's report and examination concluding that a witness had a very low-risk of re-offending, was easily led by others, had borderline intelligence, and had alcohol abuse problems, because even assuming the United States had knowledge of the report before trial, the jury could observe the witness' diminished capacity for itself while he was on the stand and the witness was subjected to cross-examination regarding his consistent statements and the benefit he received from

testifying); United States v. Croft, 124 F.3d 1109, 1124 (9th Cir. 1997)(holding that the district court did not err in refusing the defendant's request for psychological or psychiatric information regarding the United States' witnesses because she did not show that had the evidence been produced, the trial outcome would have been different, and specifically, the defendant did not demonstrate how such information would have been helpful when her counsel already elicited the fact that a witness suffered complete memory loss for three years before suddenly remembering that the defendant had given the witness money to purchase guns); United States v. Taylor, 983 F.2d 1059 (Table), No. 92-5048, 1993 WL 3479 at *1 (4th Cir. January 11, 1993)(holding that there was no Brady violation when the government disclosed a psychological evaluation about a United States' witness before that witness' cross-examination regarding a learning disability affecting his ability to recall details of past events, despite the defendant's specific discovery request for timely production of that evidence because it was disclosed in time for effective cross examination); White v. Jones, 636 F.Supp. 772, 774, 778-79 (S.D.N.Y. 1986)(rejecting the defendant's contention that the trial court's decision not to permit the defendant's counsel to examine a psychiatric report detailing the victim's condition a short time before the rape incident violated his due process rights, because counsel was aware of the victim's psychiatric history, and because the defendant's counsel elicited the same information contained in the report during cross-examination of the victim). But see Freeman v. United States, 284 F.Supp.2d at 225-26 (holding that a letter written by the United States' key witness' psychiatrist expressing doubt about the ability of the witness to testify was material, because it brought into question the reliability of that witness who was key and uncorroborated).

## ANALYSIS

Gould has not demonstrated that the United States suppressed evidence concerning Verdin-Rendon's mental state, or that any such evidence was favorable or material to the outcome of his trial.

The record shows that before trial the United States produced the documents that Gould now seeks. The Court will therefore deny Gould's motion.

## I.    GOULD HAD THE BENEFIT OF COMPLETE DISCOVERY.

The record manifests that the United States and Gould did communicate well about the production of the psychological evidence.  The lack of precision in Gould's requests, and failure to be specific and to ask for another copy, suggest that the psychological reports were not that important to his pretrial preparation.  In any case, Gould has not shown, by a preponderance of the evidence, that the United States suppressed the production.[3]

### A.    THE PSYCHOLOGICAL EVIDENCE WAS DISCOVERABLE UNDER RULE 16.

The United States does not dispute that the psychological evidence constitutes Brady material. See Tr. at 47:4-8 (Court & Rice); Fed. R. Crim. P. 16(a)(1)(F)("Reports of Examinations and Tests. Upon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports of any physical or mental examination and of any scientific test or experiment if: (i) the item is within the government's possession, custody, or control; (ii) the attorney for the government knows -- or through due diligence could know -- that the item exists; and (iii) the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial.")(emphasis added).  Rather, the United States asserted that it disclosed that evidence to Gould, despite Gould's repeated protestations to the contrary.  See New Trial Motion, Exhibit 2,

---

[3] While the Court did not find any cases addressing specifically the exact burden of proof for a defendant moving upon a Brady violation, there is some language in Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002), that suggests the defendant must meet his burden of proof by a preponderance of the evidence: "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant." Id. at 1230-31 (internal quotations omitted)(emphasis added).

Letter from Mark Blumberg to Stephen Aarons at 1 (dated February 28, 2007)(stating that the United States reviewed its discovery disclosures, determined it had complied with its obligations).

### B. GOULD IDENTIFIED THE BRADY MATERIAL, AND MADE TIMELY AND NUMEROUS DEMANDS FOR ITS PRODUCTION.

There is no dispute that Gould identified the Brady material and made timely and numerous demands for its production.  Gould filed his first Notice of Brady Requests on December 24, 2003.  See Defendant Gould's Brady Requests, filed December 24, 2003 (Doc 22).  On March 14, 2007, Gould filed his Second Notice of Brady Requests.  See Defendant John Gould's Second Notice of Brady Requests ¶ 9, at 3, filed March 14, 2007 (Doc. 267).  The Second Notice listed Verdin-Rendon's psychological records among a host of other material that Gould asserted that he had not received.  See id.  Additionally, before opening statement, Gould's counsel lodged an objection outside the jury's presence:

> The Court excluded reference to those [psychiatric] findings and diagnoses in Order 284.  We have not been given the medicals.  The government [is] privy to them, and we talked about them in front of the court.  There was an issue about Mr. Verdin in [his] release pretrial in the material witness warrant, but that's somewhat part and parcel of the motion to dismiss.

March 21 Trial Tr. at 19:13-19 (Aarons).

### C. THE UNITED STATES DID NOT INTENTIONALLY SUPPRESS THE PSYCHOLOGICAL EVIDENCE.

Gould contends that there should be no dispute in this case that the United States suppressed evidence within the meaning of Brady.  See Motion ¶ 13, at 5. Gould contends that the United States had no intention of disclosing the Verdin-Rendon documents before trial.  See id. The evidence, however, indicates that the United States intended to produce the information, thought it had done so, stated that it had done so, and believes today that it did so.

On February 16, 2007, Gould's counsel identified certain bates-ranges of documents which

-31-

he asserted that he did not possess and transmitted the list by electronic mail to the United States' counsel.  See Mr. Blumberg's February 16, 2007 letter. The United States reviewed its discovery disclosures, determined it had complied with its obligations, and informed Gould of that fact in a letter dated February 28, 2007.  See id.  On February 28, 2007, the United States' counsel, Mr. Mark Blumberg, wrote: "In sum, despite the gap in numbering that you see, the government has fully complied with all of its obligations."  Mr. Blumberg's February 28, 2007 letter at 1.

There is no doubt that the United States could have been more precise in its response.  Rather than acknowledging that there was a gap in the bates-numbering, it should have been more careful in its response and stated it had produced these materials in the gap.  Such a response would have put Gould on notice that the United States thought it had sent these documents rather than misleading Gould into believing that the United States was withholding certain documents.

Nevertheless, Gould has not proved -- by a preponderance of the evidence -- that the United States intended to suppress the psychological reports.  At most, Gould has shown that the United States was sloppy and imprecise in its responses, and should have been more careful.  When the Court reviews the entire record, the Court is convinced that the United States intended to produce this psychological evaluation.  Moreover, Gould has not identified any incentive or reason why the United States would want to suppress this information.

At the hearing on this matter, the United States represented that it provided Gould with "extraordinary pre-trial discovery" because it gave Gould "virtually unlimited access to all evidentiary materials in its files, including statements covered by the Jencks Act, years in advance of the 2007 trial." Response at 7.  Whether such production occurred is a separate issue.  What does appear clear, however, is that the United States intended to produce the psychological evaluation.

The United States' intent, or lack of intent to suppress, however, is irrelevant under the Brady

analysis, and specifically to the suppression prong of <u>Brady</u>.  On the other hand, the United States' lack of intent does narrow the factual issues.  The remaining issue under the suppression prong is whether the United States inadvertently failed to mail the materials or whether the United States Postal Service failed to deliver them.

### D. GOULD HAS NOT PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT THE UNITED STATES DID NOT PRODUCE THE PSYCHIATRIC DOCUMENTS TO HIM.

The evidence in this case points in different directions as to whether Gould actually received the psychological reports.  The Court is convinced that the United States intended to produce the reports, but is concerned whether the reports were mailed or whether Gould ever received them.  On the other hand, when the United States repeatedly stated that it had produced the report, Gould did not specifically ask for another copy, and his evidence of what is not in his attorney's files has gaps, too.  In the end, Gould has not met his burden of proving, by a preponderance of the evidence, that the United States did not produce the report and that it did not receive it before trial.

At the hearing on this matter, the United States acknowledged that it has no way to establish that Ms. Parker's April 30, 2004 letter was mailed.  <u>See</u> Tr. at 50:5-17 (Court & Rice).  Gould suggested that "[t]here are some facts that suggested [Ms. Parker's April 30, 2004 letter] may not have been mailed."  Tr. at 18:12 (Aarons). Gould contends that his counsel's e-mail and letter confirm that the United States did not disclose the Verdin-Rendon documents.  <u>See</u> Motion, Exhibit 1, e-mail from Stephen D. Aarons to Mark Blumberg (dated February 16, 2007); Motion ¶ 4, ¶ 13, at 2, 5.

There is no suppression of <u>Brady</u> material if the United States produced the Verdin-Rendon psychological records to Gould.  Here, while there are problems with the United States' representations, and its proof is not airtight, it has produced a letter showing that it sent the report.

In contrast, while Gould's investigator testified that he does not recall ever receiving the letter, he admits that he has not throughly searched the files and records since the trial to see if the April 30, 2004 letter or report is there now.  Moreover, Gould admits that his file was internally closed when he pled guilty and had to be reopened and reassembled when the Court granted his motion to withdraw his guilty plea.  The Court is concerned that the letter was sent, Gould received it, the report was not input because he plead guilty, was not extremely important before trial because of the crunch of other pre-trial matters, and may not have been reviewed before trial.  In any case, while the record before the Court raises questions and the Court has concerns, Gould has not convinced the Court, by a preponderance of the evidence, that the United States did not produce the report.

Moreover, there the United States did not suppress Brady material if Gould had access to the allegedly exculpatory information in a different form than the exact form Gould requested.  See,e.g. United States v. Hernandez-Muniz, 170 F.3d at 1010 (holding that the United States did not suppress the defendant's statement because it was provided at the preliminary hearing, and due process does not require the United States to disclose the information in a specific manner or form); Rivera v. United States, 494 F.Supp.2d at 386 n.7 (holding that there was no Brady violation when the United States provided the defendant with essentially the same information contained within a psychological evaluation of a witness, even if the evaluation itself was not disclosed to the defendant).

Gould knew that Verdin-Rendon had severe mental problems.  That situation was not disputed at trial.  The jury knew it.  However, the material information about Verdin-Rendon's mental condition was provided to Gould and to the jury.

Gould's argument is not that he and the jury did not know that Verdin-Rendon had mental problems.  Rather his contention is that, if he had the report, he could have learned techniques to control Verdin-Rendon and to get him to talk on the witness stand.  While this information might

-34-

have been helpful in deciding whether to call Verdin-Rendon, and in preparing for cross-examination, this "technique" information would not have been known to the jury. Accordingly, Gould has not shown, by a preponderance of the evidence, that the United States has suppressed any evidence that would have been shared with the jury.

### E.     THE UNITED STATES DID NOT MISREPRESENT TO THE COURT ITS DISCLOSURE OF VERDIN-RENDON'S PSYCHOLOGICAL RECORDS.

The CPE document forms the basis of Gould's motion. Gould maintains that the United States' promised disclosure of that document did not take place. See New Trial Motion ¶ 2, at 1. Gould states that his counsel was not given access to psychiatric records discussing Verdin-Rendon's competency to testify. See id. ¶ 13, at 5.

Gould does not, however, adequately support his assertion that the United States declined to provide him with materials in its possession relating to Verdin-Rendon's mental condition. See Tr. at 13:10-14 (Court & Garrity)(Garrity acknowledging that he does not know if anyone from Mr. Aaron's office or Garrity's office has gone through the Gould files to see if Ms. Parker's April 30, 2004 letter was in the correspondence.). The United States, on the other hand, has consistently and repeatedly represented that it produced all materials in its possession concerning Verdin-Rendon's mental condition. See Mr. Blumberg's February 28, 2007 letter.

From the record before the Court, Gould has not convinced the Court that the United States did not provide Gould with extraordinary pre-trial discovery. Although not legally obligated to do so, the United States provided Gould with practically unlimited access to all evidentiary materials in its files, including statements that the Jencks Act covers, years in advance of the 2007 trial. See Response at 7. That early production, and Gould's plea, may have contributed to the current problem. In any case, there is evidence that as part of those disclosures, the United States provided Gould with

documents relating to Verdin-Rendon's competence on April 30, 2004.  <u>See</u> Parker's April 30, 2004

letter.  These documents were bates-numbered 4093-4114, and were accompanied by a detailed index

describing each document.  <u>See id.</u>  Moreover, the United States ensured that Verdin-Rendon would

be available to Gould by seeking a material witness warrant and by arranging for Gould to take

Verdin-Rendon's rule 15 deposition.  <u>See</u> Motion ¶ 3, at 1-2.

Gould's contention that the United States withheld these documents lacks evidentiary support.

Gould has not overcome the United States' representations and proof that the materials were provided

to Gould over three years ago.  In sum, Gould has not shown, by a preponderance of the evidence,

that the United States suppressed evidence.

## II.      THE CPE UNDERMINES VERDIN-RENDON'S CREDIBILITY AS A WITNESS.

Gould contends that, absent the psychiatric record and competency evaluations, his counsel

in the end, declined to call Verdin-Rendon.  <u>See</u> New Trial Motion ¶ 13, at 5.  Gould contends that

the psychiatric documents would have provided "untold insight which  have weighed into counsel's

precarious decision whether to call the witness to the stand."  <u>Id.</u>  Gould contends that his decision

was made even more precarious by the United States' violation of his constitutional right to have

access to the information within the United States' possession.  <u>See id.</u> Gould argues that the United

States' failure to timely disclose items "critical" to the defense rendered counsel ineffective,

preventing his counsel from learning about important information that would have helped him decide

whether to present a defense and whether to call a key witness -- the victim himself.  <u>Id.</u> ¶ 17, at 7.

### A.      TESTIMONY OF THE VICTIM IS NOT GENERALLY FAVORABLE TO A
###         DEFENDANT.

Gould contends that the psychological evidence that the United States suppressed in this case

should be treated as favorable to him.  <u>See</u> Tr. at 34:19-21 (Aarons).  The Court must start its analysis

-36-

of favorability by first noting that, contrary to the typical scenario, where defense counsel is usually more than happy not to see the victim take the stand, here Gould suggests, however, that he had numerous areas of defense evidence to present through Verdin-Rendon were he to testify at trial.

Gould represents that he would not have used the Verdin-Rendon psychological documents for impeachment. See Motion ¶ 25, at 9. Instead, he contends that he would have used the materials to evaluate whether to call Verdin-Rendon as one of his witnesses. See id. At the hearing on this matter, Gould conceded that he does not know how he would have used the Verdin-Rendon psychological materials if he had them.

> COURT: [Y]ou made this representation that you did not seek the information to embarrass or to impeach, so it was solely for your personal evaluation of whether to put the witness on the stand. Correct?
>
> MR. AARONS: I don't know how I would have used it. I know some things that for sure I didn't -- as I look at it now with [hindsight], would I see that information was being highly favorable to the defense. And I guess I'm agreeing with you, because our purpose in had we called him would not have been to say[:] ["Y]ou're a slow person or you don't know what you're talking about.["] In fact, what we wanted to establish, if we had a little better insight into [Verdin-Rendon], was that he never saw John Gould do anything other than spray pepper on him, but we were [handcuffed] in a number of ways, and the Government knew -- should have known we were handcuffed. We were handcuffed because . . . he didn't want to talk to us. This [psychological report] is a roadmap of how to talk to [Verdin-Rendon]. [That] person was able to get him to open up. All he did was talk about soccer, which was Verdin[-Rendon's] favorite subject and talked about Central America briefly with him, and certainly we could have gotten someone who is a [Spanish] speaker to talk to him and get him feeling comfortable in the process. But I didn't have access to that.

Tr. at 27:23-28:4-23 (Court & Aarons).

There was nothing about the Verdin-Rendon psychological materials that was "obviously

-37-

exculpatory." Smith v. Secretary Dep't of Corr., 50 F.3d at 826-27. Moreover, Gould was unable to articulate in his Motion and at the hearing why the Verdin-Rendon psychological materials were favorable to him. Gould's assertion that the Verdin-Rendon psychological materials, in hindsight, may have led him to call Verdin-Rendon to testify on his behalf at trial does not demonstrate favorability.

At most, the evidence might have helped him decide to call Verdin-Rendon. There is no evidence that Verdin-Rendon would have given any more favorable testimony on the issues than the jury received through Agent Russ. In sum, Gould has not proved, by a preponderance of the evidence, that the psychological evaluation is favorable to him.

### B.    THE PSYCHOLOGICAL EVIDENCE WAS NOT MATERIAL.

In addition to his failure to establish that the United States withheld the psychological documents, and that the documents would have been favorable to him, Gould has not established that those documents were material to his defense. As an initial matter, the Court notes that Gould is not arguing that the CPE itself would have effected the verdict. See Tr. at 27:23-28:4-23 (Court & Aarons)(noting that Gould's counsel did not know how he would have used the Verdin-Rendon psychological reports). Rather, he is arguing that they would have helped him decide whether to call Verdin-Rendon at trial and that they would have helped him control him as a witness.

Because the United States did not call Verdin-Rendon as a witness, his credibility was not an issue in the United States' case, and the CPE had no bearing on the United States' proof. The CPE could not have effected the outcome of the trial because it does not bear on the elements of Gould's offenses.

Unable to argue that the CPE itself would have changed the result of the trial, Gould contends that he wanted to call Verdin-Rendon as a witness at trial and that he refrained from doing so because

he was unsure of Verdin-Rendon's mental competence.  <u>See</u> Motion ¶ 13, at 5.  Gould speculates that, if he had been privy to the disputed documents, the information contained in the documents might have enabled him to call Verdin-Rendon as a credible witness at trial.  <u>See</u> <u>id.</u>  Speculation aside, the psychological documents themselves show that Verdin-Rendon is mentally ill, and that the credibility of his statements and perceptions is unreliable.  <u>See</u> CPE at 4108 (concluding that Verdin-Rendon "ha[d] . . . a factual **but not** a rational understanding of the charges against him; and **he [did not]** have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding.")(emphasis in original).

Moreover, nothing in the documents suggests any means of improving Verdin-Rendon's condition such that he might have become a credible witness.  Gould has not established that he would have called Verdin-Rendon as a witness if he knew the contents of the psychological documents.   Although Gould has represented that he would have "[d]efinately" called Verdin-Rendon if he would have had access to the psychological evaluation, Tr. at 29:14-18 (Court & Aarons), he was still unable to articulate why the psychological documents would have enabled him to call Verdin-Rendon as a witness in his defense.

The documents in question were not material in Gould's defense.  While Gould states that Verdin-Rendon's psychological report would have been a "road map" on how to speak with Verdin-Rendon, his counsel's interaction with Verdin-Rendon in fact illustrates the immateriality of the disputed documents.  Tr. at 27:23-28:4-23 (Court & Aarons). Gould and his counsel saw Verdin-Rendon on September 29, 2006, when the United States arranged for Gould to take Verdin-Rendon's deposition.  <u>See</u> Motion ¶ 3, at 1-2.  This meeting with Verdin-Rendon took place over three years after the mental evaluations that are the subject of this motion were conducted.

As Gould acknowledges, on that occasion, Verdin-Rendon was noncommunicative and

-39-

refused to answer questions from Gould's counsel.  See id.  Based on this encounter in September 2006, Gould most likely had more insight into how Verdin-Rendon was likely to testify than he could have obtained from written reports created in 2003.  Subsequent to Verdin-Rendon's refusal to submit to a deposition, Gould did not make any effort to compel Verdin-Rendon's testimony or to have the Court undertake a competency evaluation.  The most reasonable conclusion that can be drawn from Gould's failure to pursue Verdin-Rendon as a witness at trial is that Gould's personal observations convinced him not to call Verdin-Rendon as a witness at trial.

Although Verdin-Rendon did not testify, much of the information contained within the CPE was elicited at trial.  At the trial, The United States characterized Verdin-Rendon as "slow" and "child-like, not functioning at a fully adult level."  March 21 Trial Tr. at 28:20-21.  Gould advanced the defense that Verdin-Rendon could not identify Gould as one of his assailants.  See id. at 58:11-12; id. at 286:7-19.  The United States elicited testimony that Verdin-Rendon's recollections were not completely reliable and he did not know completely who had attacked him.  See March 28 Trial Tr. at 44:11-45:22.  It also elicited testimony that Verdin-Rendon has mental health issues.  See id.  Thus, it appears that, even assuming the United States did not disclose the Verdin-Rendon psychological reports to Gould, the crux of the CPE was elicited throughout Gould's trial.

Gould contends that the psychiatric records would have shown him ways to resolve issues regarding his refusal to cooperate during questioning.  At the hearing on this matter, Mr. Aarons suggested

> [that psychological report] [wa]s a roadmap of how to talk to [Verdin-Rendon].  . . . All he did was talk about soccer, which was Verdin[-Rendon's] favorite subject and talked about Central America briefly with him, and certainly we could have gotten someone who is a [Spanish] speaker to talk to him and get him feeling comfortable in the process.  But I didn't have access to that.

Tr. at 27:23-28:23 (Court & Aarons). It is possible that Mr. Aarons could have replicated in the

courtroom before the jury what the psychologist did in his examination, but it is also possible that the courtroom scene could have resembled the September 2006 interview attempt.  In any case, Gould does not adequately explain how his ability to more effectively question Verdin-Rendon would have resulted in a "probability sufficient to undermine confidence in the outcome" of his trial.  United States v. Velarde, 485 F.3d at 559.

Further, the CPE undermines Gould's ability to use Verdin-Rendon as a defense witness.  In his motion, Gould lists several additional potential defenses that he might have asserted through Verdin-Rendon.  See Motion at 6-7.  Gould's ability to call Verdin-Rendon himself to assert all of these defenses depends on Verdin-Rendon's credibility as a witness.  The CPE makes Verdin-Rendon a less credible witness, not a more credible one.  Rather than enabling Gould to call Verdin-Rendon, the CPE and other psychological documents counsel and weigh against that decision.     G o u l d argued at the hearing on this matter that, even if Verdin-Rendon was found incompetent to stand trial, he still may have been competent to testify, because Verdin-Rendon could perceive the event and know how to tell the truth, and Verdin-Rendon "certainly ha[d] a lot of perceptions that [he was] capable of describing in some detail."  Tr. at 44:17-20 (Court & Aarons).  The Court acknowledges that there is a low threshold for competency to testify.  See Bickford v. John E. Mitchell Co., 595 F.2d 540, 544 (10th Cir. 1979)("Rule 601 of the Federal Rules of Evidence provides that every person is competent to be a witness except as otherwise provided in the rules."). The Court must ask: "Is his capacity to observe, remember, and recount, such that he can probably bring added knowledge of the facts?"  Bartow v. Armstrong World Indus. Inc.,  923 F.Supp. 1442, 1445 (D.N.M. 1996)(quoting C. McCormick, McCormick on Evidence § 62, at 156 (3d ed. 1984)). Gould has not demonstrated that there was anything in the Verdin-Rendon psychological documents that would have cured his counsel's inability to converse with Verdin-Rendon.  See Motion ¶ 3, at 1-2 (noting

that Verdin-Rendon refused to answer any questions posed by Gould's counsel).

In conclusion, if Gould believed that the psychological documents were material to his case, he could have asked the United States to produce another copy of those documents.  He did not do so.  Gould maintains that he complained about the non-disclosure of the Verdin-Rendon psychological materials in his motion in limine and repeatedly at trial, see Tr. at 26:5-11 (Aarons), but the United States represented that it did not give Gould those materials again after he brought up the concern regarding missing discovery pages (bates numbered 4093-4114) because he did not specifically ask for them,  see Tr. at 49:18-50:2 (Court & Rice).  Moreover, those documents do not bear a material relationship to the outcome of the trial.  See, e.g. Coleman v. Saffle, 912 F.2d at 1222 (noting that a psychological evaluation on the defendant was not material where it contained unfavorable evidence, and thus even if it had been disclosed, the result of the proceeding would have been the same); United States v. McMahon, 715 F.2d at 501 (noting that psychiatric reports of the United States' key witnesses were not material because the defendants had ample opportunity to attack the credibility of the witness' testimony and there was no indication that the attack would have been strengthened if the psychiatric reports had been disclosed).

**IT IS ORDERED** that Defendant John Gould's Motion for New Trial is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Larry Gomez
  Acting United States Attorney
Paul Spiers
  Assistant United States Attorney

-42-

Albuquerque, New Mexico

-- and --

Mark Blumber
Kristy Parker
  Trial Attorneys
United States Department of Justice
Civil Rights Division, Criminal Section
Washington, D.C.

     *Attorneys for the Plaintiff*

Stephen Aarons
Santa Fe, New Mexico

     *Attorney for the Defendant*