IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                            No. CR 03-2274 JB

JOHN GOULD and
VIOLET GOULD,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Sealed Motion to Supplement Motion for New Trial, filed May 6, 2009 (Doc. 433)("Second Motion for New Trial").  The Court held a hearing on February 23, 2011.  The primary issue is whether the Court should grant a new trial because the Plaintiff United States of America did not produce documents from 2005 regarding the victim's psychological state.  The Court will deny Defendant John Gould's motion for new trial, because, although it finds that the United States suppressed the evidence, it finds that J. Gould has not demonstrated that the evidence was favorable to him or that the evidence was material.

## FACTUAL BACKGROUND

A grand jury charged J. Gould, a former lieutenant of the Dona Ana County Detention Center ("DACDC"), with, among other things, violating the civil rights of Tampico Verdin-Rendon, an inmate, by using excessive force on him.  On May 5, 2005, the Honorable Karen B. Molzen, United States Magistrate Judge for the District of New Mexico, ordered Verdin-Rendon to submit to a local psychological evaluation to determine his competency to stand trial in a criminal re-entry proceeding pending against him.  See United States v. Verdin-Rendon, No. CR 05-mj-05235, Order, filed May

5, 2005 (Doc. 9)(Molzen, M.J.).  On June 3, 2005, Verdin-Rendon met with Juan N. Sosa, Ph.D. See Letter to the Honorable Karen B. Molzen from Juan N. Sosa at 1 (dated June 3, 2005), filed May 6, 2009 (Doc. 433-2)("Letter").  Verdin-Rendon was calm and compliant until Dr. Sosa asked him to consent to a psychological evaluation, at which point he became agitated and angry, refusing to consent to the evaluation.  See Letter at 1.  After he became agitated, Verdin-Rendon complained that the government harmed him, that he has been treated unfairly and that the actions of the government caused him to become paranoid and uncertain as to whom to trust.  See Letter at 2.  Dr. Sosa stated that it was doubtful that Verdin-Rendon had the ability to assist in his defense, because, although he might be able to express a factual knowledge of the charges against him, he lacked the rational ability to comprehend the purpose of the legal proceedings.  See Letter at 2.

On July 15, 2005, Verdin-Rendon again met with Dr. Sosa.  See Psychological Evaluation Report (dated July 15, 2005), filed May 6, 2009 (Doc. 433-2)("PER").  In the PER, Dr. Sosa stated that obtaining the evaluation was not an easy process, as Verdin-Rendon refused to sign the necessary forms for a period of time.  See PER at 2.  Once Verdin-Rendon signed the necessary forms, however, he "became very pleasant and cooperative."  PER at 2.  During the evaluation, Verdin-Rendon complained about an incident in 2002, where the guards at the local detention facility in which he was housed "tried to force him out of his cell and injured his left arm and elbow."  PER at 3.  Verdin-Rendon asserted that the guards beat him because he refused to leave his cell.  See PER at 3.  Dr. Sosa found that Verdin-Rendon was competent to stand trial.  See PER at 5.

> He does not show evidence of psychopathy or cognitive difficulties that would prevent him from participating in the trial process.  However, because of his severe depression, frustration with the legal process, the negative perception of the treatment he has received while incarcerated, and poor ability in social situations, he is expected to have an extremely negative response to future court proceedings.

PER at 5.  Based on the psychological evaluation and a competency hearing, Judge Molzen found

Verdin-Rendon to be competent to proceed to trial.  See United States v. Verdin-Rendon, No. CR

05-mj-05235, Order, filed September 14, 2005 (Doc. 14)(Molzen, M.J.).

## PROCEDURAL BACKGROUND

On August 25, 2004, a grand jury, in a Superseding Indictment, charged J. Gould with two

counts of violating 18 U.S.C. § 242 -- deprivation of rights under color of law -- and two counts of

violating 18 U.S.C. § 1512(b)(3) -- witness tampering.  See Superseding Indictment, filed August

25, 2004 (Doc. 91).

On September 11, 2006, Assistant United States Attorney ("AUSA") Richard C. Williams

moved the Court for an order authorizing release of the mental health information relating to Verdin-

Rendon obtained during the 2005 criminal re-entry proceeding to the attorneys for the United States

in United States v. John Gould, et. al., No. CR 03-2274 JB.  See Sealed Ex Parte Motion of the

United States, filed September 11, 2006 (Doc. 201)("Sealed Ex Parte Motion").  In 2005, Verdin-

Rendon was charged with a violation of 8 U.S.C. § 1326 -- re-entry of a deported alien in Case No.

05-mj-05235-KBM.  See Sealed Ex Parte Motion at 1.  The motion stated that, in connection with

the re-entry case, a mental competency evaluation was conducted and that, because of Verdin-

Rendon's role as an alleged victim and material witness in United States v. John Gould, et. al., No

CR 03-2274 JB -- this case -- his mental health information would possibly be relevant in the matter

under Brady v. Maryland, 373 U.S. 83 (1963) and/or Giglio v. United States, 405 U.S. 150 (1972).

See Sealed Ex Parte Motion at 1.  Williams attached the Letter to Judge Molzen and the 2005 report

to the motion.  In the motion, Mr. Williams asserted that he served the motion -- not the attachments

-- on counsel for Verdin-Rendon as a material witness and on the attorneys for the United States in

United States v. John Gould, et. al., No. CR 03-2274 JB.  See Sealed Ex Parte Motion at 2.

On September 14, 2006, pursuant to the Court's instructions, the Court's Courtroom Deputy Clerk called Mr. Williams to tell him that the Court would not sign the proposed order authorizing release of Verdin-Rendon's mental health information to the attorneys for the United States in No. 03-2274 JB, because it did not understand why he was proceeding ex parte or why he needed the Court to facilitate the transfer of information between government lawyers.  Mr. Williams never responded.  The Sealed Ex Parte Motion thus sat, not granted, on the case's docket.

On April 2, 2007, a jury found J. Gould guilty of deprivation of rights under color of law as charged in Counts 1 and 2 in the Indictment and guilty of obstruction of justice as charged in Counts 2 and 4 in the Indictment.  See Verdict, filed April 2, 2007 (Doc. 337).

On April 10, 2007, J. Gould filed Defendant Gould's Motion for New Trial.  See Doc. 345 ("First Motion for New Trial").  In his motion, J. Gould argued that the United States committed a Brady violation by not producing a psychiatric evaluation of Verdin-Rendon.  See First Motion for New Trial at 8-10.  This motion was largely related to whether the United States withheld a competency evaluation of Verdin-Rendon from a 2003 criminal re-entry proceeding against him. The parties' arguments did not revolve around the materials from the 2005 report, because neither J. Gould nor the United States attorneys trying J. Gould's case had the materials from the 2005 report at that point.

The Court issued a Memorandum Opinion and Order on January 2, 2008, denying J. Gould's motion for a new trial.  See Memorandum Opinion and Order at 1, filed January 2, 2008 (Doc. 408)("Jan. 2, 2008 MOO").  The Court found that J. Gould did not satisfy his burden under rule 33(d) of the Federal Rules of Criminal Procedure of establishing that "the United States failed to produce evidence that was materially beneficial to his defense," because "the United States represents that it produced [the victim's] psychiatric evaluation to . . . [J.] Gould, and because the

evaluation weighs against [the victim's] credibility as a witness."  Jan. 2, 2008 MOO at 1.  The

Court found that J. Gould did not prove by a preponderance of the evidence that the United States

did not produce the psychiatric documents to him.  See Jan. 2, 2008 MOO at 33.

> [J.] Gould's contention that the United States withheld these documents lacks
> evidentiary support.  [J.] Gould has not overcome the United States' representations
> and proof that the materials were provided to [J.] Gould over three years ago.  In
> sum, Gould has not shown, by a preponderance of the evidence, that the United
> States suppressed evidence.

Jan. 2, 2008 MOO at 36.  Addressing [J.] Gould's arguments that, absent the psychiatric record and

competency evaluations, his counsel declined to call Verdin-Rendon and that the failure to timely

disclose the items prevented counsel from learning important information that would have helped

him decide whether to present a defense and call the victim, the Court stated that, at most,

> the evidence might have helped [J. Gould] decide to call Verdin-Rendon.  There is
> no evidence that Verdin-Rendon would have given any more favorable testimony on
> the issues than the jury received through Agent Russ.  In sum, [J.] Gould has not
> proved, by a preponderance of the evidence, that the psychological evaluation is
> favorable to him.

Jan. 2, 2008 MOO at 38.  The Court also found that the psychological evidence was not material to

J. Gould's defense,  because J. Gould did not demonstrate that disclosure of the evaluation would

have changed the result of the trial.  See Jan. 2, 2008 MOO at 38-42.

On February 26, 2008, the United States moved for an order as to Christopher Tagert, Van

Tyler Fraembs, J. Gould, and Violet Gould authorizing the release to defense counsel of mental

health information from 2005 relating to Verdin-Rendon.  See Motion to Disclose Mental

Competency Evaluation, filed February 26, 2008 (Doc. 418)("Motion to Disclose").  The United

States set forth the procedural history of the case:

> On September 11, 2006, Assistant United States Attorney Richard Williams
> filed a sealed *ex parte* motion with this Court seeking authority to disclose this
> information.  On September 12, 2006, Assistant United States Attorney Miles

Hanisee informed Magistrate Judge Robert H. Scott of the existence of this information at a hearing in open court on Verdin's custodial status pursuant to a material witness warrant. On April 2, 2007, defendant [J.] Gould was convicted of violating Verdin's civil rights by assaulting him while acting in his official capacity as a supervisory corrections officer at the Dona Ana County Detention Center in Las Cruces, New Mexico, and of obstructing a subsequent investigation of that assault. Based on the undersigned's review of the docket, the Court never ruled on the sealed motion filed by AUSA Williams.

On April 10, 2007, defendant [J.] Gould filed a Motion for New Trial which largely concerned whether or not the government withheld a separate report on Verdin's competency created in 2003.  In an order dated January 2, 2008, this Court denied defendant [J.] Gould's motion on the grounds that there was insufficient evidence to establish either that the report had been suppressed, or that it was material to the outcome of defendant [J.] Gould's trial. On January 22, 2008, AUSA Williams contacted undersigned counsel and trial counsel Mark Blumberg to note that the Court had apparently not ruled on his motion to disclose the 2005 report. The undersigned subsequently obtained a copy of the 2005 report from the Court.

Motion to Disclose at 1-2.  The United States represented that no member of the Civil Rights Division's trial team "has ever seen, or been in possession of, this document prior to the time that we obtained it from the Court."  Motion to Disclose at 2 n.2.  The United States stated that, having reviewed the report, it did not believe it contained any exculpatory information or information material to J. Gould's defense in the sense that it could have affected his decision to call Verdin-Rendon as a witness, but, out of caution, asked the Court for an order authorizing it to disclose the report to defense counsel so that defense counsel may review the report and seek any relief he deemed appropriate.  See Motion to Disclose at 2.

On April 16, 2008, the United States filed a Motion to Disclose Mental Competency Evaluation, in the same form as the document it filed on February 26, 2008, as to J. Gould.  See Doc. 422. On March 25, 2009, the Court entered an order, granting the Motions to Disclose and allowing the United States to disclose the 2005 report to defense counsel.  See Order, filed March 25, 2009 (Doc. 431).  The United States thereafter produced Verdin-Rendon's 2005 report to J. Gould's

counsel.

On May 6, 2009, the day scheduled for his sentencing, J. Gould filed his Sealed Motion to Supplement Motion for New Trial.  See Doc. 433 ("Second Motion for New Trial").  In his motion, J. Gould asserts that the United States failed to produce the 2005 report, which he attached to the motion.  See Second Motion for New Trial at 1.  J. Gould asserts that the 2005 report provided a blueprint on how to get past Verdin-Rendon's obstinacy.  See Second Motion for New Trial at 1.  J. Gould asserts that, because the United States did not disclose the 2005 report, he was at an extreme tactical disadvantage: "[Verdin-Rendon] had refused to give a videotaped statement before trial because he was complaining of a headache, and counsel could not assess his competency to testify at trial based on his refusal."  Second Motion for New Trial at 1.  J. Gould asserts that the 2005 report reveals that Verdin-Rendon was competent to testify at trial and would have complied had the Court ordered him to testify on pain of contempt.  See Second Motion for New Trial at 2.  J. Gould asserts that the negligent or deliberate failure to supply defense counsel with the 2005 report rendered counsel ineffective in the decision whether to call Verdin-Rendon.  See Second Motion for New Trial at 2.  J. Gould further asserts that Verdin-Rendon's testimony was important to the defense case.  See Second Motion for New Trial at 2.  J. Gould also asserts that the timely disclosure of the 2005 report would have identified Dr. Sosa as a defense witness able to explain Verdin-Rendon's psychiatric condition.  See Second Motion for New Trial at 3.

On June 11, 2009, the United States filed its Opposition to Defendant Gould's Supplemental Motion for New Trial.  See Doc. 434 ("Opposition").  The United States argued that it did not suppress the 2005 mental health evaluation, because it is undisputed that Mr. Williams submitted the 2005 report to the Court for an in camera inspection in advance of any disclosure, and that the Court declined to order the report disclosed.  See Opposition at 3.  The United States further argues

that the 2005 report does not contain exculpatory information and that the information that goes to Verdin-Rendon's credibility is not discoverable under <u>Giglio v. United States</u>, because the United States did not call Verdin-Rendon as a witness.  <u>See</u> Opposition at 4.  The United States also argues that the evaluation was not material, because it cannot be said that, even if J. Gould decided to call Verdin-Rendon at trial because of the evaluation, that Verdin-Rendon's testimony was reasonably likely to change the outcome of the trial.

At the hearing, J. Gould's counsel asked that the Court treat his supplemental motion for a new trial as a separate pending motion for a new trial.  <u>See</u> Transcript of Hearing at 31:19-22 (taken February 23, 2011)(Aarons)("Tr.").[1]  The United States represented that it too recalled that the supplemental motion was a separate motion.  <u>See</u> Tr. at 34:13-15 (Parker).  J. Gould represented that he did not have any additional arguments to present to the Court regarding the motion and that his purpose in filing the motion was to get the report in the record proper.  <u>See</u> Tr. at 2:24-3:3 (Aarons). J. Gould stated that the motion did not raise any new issues that the Court did not cover in its Jan. 2, 2008 MOO.  <u>See</u> Tr. at 3:6-10 (Court, Aarons).  The United States also represented that it did not wish to present further argument on the motion and that the issues it presented were the same as J. Gould's first motion for new trial.  <u>See</u> Tr. at 4:6-8 (Parker).  Although both parties represented that J. Gould's second motion for new trial did not present any new issues to the Court, the parties' arguments surrounding J. Gould's first motion for new trial centered on the 2003 report, not the 2005 report, since neither party had the 2005 report at the time.  The Court's Memorandum Opinion and Order thus centered on the 2003 report as well.  The Court therefore will now address the 2005 report.

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version. The final transcript may contain slightly different page and/or line numbers.

# RULE 33

Rule 33 provides:

**(a) Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b) Time to File.**

> **(1) Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

> **(2) Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bold in original).  "A motion for a new trial is not regarded with favor and is only issued with great caution."  United States v. Herrera, 481 F.3d 1266, 1269-70 (10th Cir. 2007)(citing United States v. Trujillo, 136 F.3d 1388, 1394 (10th Cir. 1998)).  Ordinarily, a district court's denial of a motion for a new trial is reviewed for abuse of discretion.  See United States v. Herrera, 481 F.3d at 1270 (citing United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999), cert. denied, 529 U.S. 1029 (2000). ).

## LAW REGARDING MOTIONS FOR NEW TRIAL BASED ON ALLEGED BRADY VIOLATIONS

When the United States withholds evidence on demand of a defendant that, if made available, would tend to exculpate him, such suppression of evidence can violate the defendant's due process rights.  See Brady v. Maryland, 373 U.S. at 87.  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  See Fed. R. Crim. P. 33(a).  Motions for new trials are, however disfavored, and "should only be granted with great

caution."  United States v. Quintanilla, 193 F.3d at 1146 (reversing district court's grant of a new trial motion based in part on alleged violations under Brady v. Maryland).

A defendant seeking a new trial based on an alleged Brady v. Maryland violation has the burden to demonstrate that: "[i] the prosecution suppressed evidence, [ii] the evidence was favorable to the defendant, and [iii] the evidence was material."  United States v. Velarde, 485 F.3d 553, 558 (10th Cir. 2007).   "Evaluation of a Brady claim asserted in a motion for a new trial involves an application of [those] three elements . . . and not the five-prong . . . test utilized in typical newly discovered evidence claims."  United States v. Quintanilla, 193 F.3d at 1149 n.10 (citation omitted). "While an open file policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 828 (10th Cir. 1995)(emphasis in original)(internal quotations omitted).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more.  But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. 419, 437 (1995)(internal citation omitted).

The United States' good faith or bad faith is irrelevant.  See Brady v. Maryland, 373 U.S. at 87; United States v. Quintana, 673 F.2d at 299 ("Under Brady, the good or bad faith of government agents is irrelevant." (citation omitted)).   "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence

-10-

never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." Kyles v. Whitley, 514 at 433 (internal quotations omitted). On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823 (citation omitted).

      **1.**    **Suppression.**

      A defendant seeking a new trial based on an alleged violation under Brady v. Maryland must demonstrate that the prosecution suppressed evidence. "The prosecution must only reveal information that it had in its possession or knowledge -- whether actual or constructive." United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999). See United States v. Velarde, No. CR 98-391 JB, 2008 WL 5993210, at *16 (D.N.M. May 16, 2008)(Browning, J.)("Brady requires disclosure of information only in the government's possession or knowledge, whether actual or constructive." (citing United States v. Beers, 189 F.3d at 130; Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (noting that, because district attorney's office had actual knowledge that there was a separate investigation by authorities in a separate county, it was reasonable to impute knowledge possessed by the separate county to prosecution))). As the United States Court of Appeals for the Tenth Circuit explained in Smith v. Secretary of New Mexico Department of Corrections, "while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a Brady claim, such proof is by no means necessary." 50 F.3d at 824.

      In United States v. Beers, the Tenth Circuit discussed the district court's denial of the defendant's motion for new trial based on the prosecutor's alleged violation of Brady v. Maryland

by failing to disclose evidence that would have impeached one of its witnesses.  See 189 F.3d at 1303.  The Tenth Circuit stated that the federal prosecutors did not have some of the materials in their possession and that the "defendant provide[d] no evidence that the federal government knew of their existence."  189 F.3d at 1303.  The Tenth Circuit held that the state's knowledge and possession of the potential impeachment evidence could not be imputed to a federal prosecutor for purposes of establishing a violation under Brady v. Maryland; therefore, the "prosecution did not suppress the alleged Brady material."  189 F.3d at 1304.

> **2.     Favorability.**

The evidence in question must be exculpatory or favorable to the defendant.  See Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825.  "It is precisely because defense counsel does not, and cannot, know what potentially exculpatory evidence the prosecutor possesses that there cannot realistically be any meaningful distinction between the prosecutor's obligation under Brady in a general request case and its obligation in a no request case."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 826-27.  The prosecution has an obligation to disclose obviously exculpatory evidence regardless whether the defense has requested the evidence.  See Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 827.  "Impeachment evidence . . . satisfies this standard."  United States v. Combs, 267 F.3d 1167, 1175 (10th Cir. 2001).

> **3.     Materiality.**

"To make the materiality determination, [the court] view[s] the evidence's significance in relation to the record as a whole."  United States v. Hughes, 33 F.3d 1248, 1252 (10th Cir. 1994). Evidence is material for purposes of granting a new trial on an alleged violation under Brady v. Maryland "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Williams, 576

F.3d 1149, 1163 (10th Cir. 2009)(citing <u>United States v. Velarde</u>, 485 F.3d at 559).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>United States v. Williams</u>, 576 F.3d at 1163 (citing <u>United States v. Velarde</u>, 485 F.3d at 559).

 In evaluating materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  <u>Kyles v. Whitley</u>, 514 U.S. at 434. The Tenth Circuit notes that:

> Under this more flexible, sliding scale approach to assessing the materiality <u>vel</u> <u>non</u> of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation.  As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation.  Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a <u>Brady</u> violation.

<u>Smith v. Sec'y of N.M. Dep't of Corr.</u>, 50 F.3d at 827.  Failure to disclose a specifically requested report is "seldom, if ever excusable."  50 F.3d at 830 (internal quotations omitted).  "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant."  <u>Scott v. Mullin</u>, 303 F.3d 1222, 1230-31 (10th Cir. 2002)(citations and internal quotations omitted).

 In <u>Coleman v. Saffle</u>, 912 F.2d 1217 (10th Cir. 1990), the Tenth Circuit considered whether medical records of a state hospital that conducted the defendant's mental competency evaluation were material.  <u>See</u> 912 F.2d at 1217.  Upon request of the defendant's counsel, a competency evaluation was done on the defendant. <u>See</u> 912 F.2d at 1220.  A letter from the state hospital's chief forensic psychiatrist reported that the defendant was competent. <u>See</u> 912 F.2d at 1220.  The detailed

medical records and evaluations were not given to the judge or counsel.  See 912 F.2d at 1220.  The

Tenth Circuit determined whether those records and evaluations were material in "the context of the

complete record."  912 F.2d at 1222.  The Tenth Circuit noted that there were several factors

unfavorable to the defendant's position in that the records and evaluations demonstrated his mental

illness.  See 912 F.2d at 1222.  These statements included that the defendant's schizophrenia was "in

partial remission, if not complete," and that the psychiatrist concluded that the defendant was

"competent in a psychiatric and legal point of view . . . ."  912 F.2d at 1222 (internal quotations

omitted).  The Tenth Circuit noted that the records "contained some damaging statements of a

different sort, unfavorable to petitioner if presented to the jury."  912 F.2d at 1222.  The unfavorable

information included descriptions of the defendant's dangerousness.  See 912 F.2d at 1222.  "Such

unfavorable evidence from the medical records would have added force to the damaging evidence

of [the defendant's] violent conduct."  912 F.2d at 1222.  The Tenth Circuit concluded that

> even if the medical records had been disclosed and used as favorable evidence as to
> [the defendant's] mental condition to argue sympathetically for him at the sentencing
> stage, nevertheless there was no reasonable probability that, had the evidence been
> disclosed to the defense, the result of the proceeding would have been different and
> there was no such probability sufficient to undermine confidence in the outcome.

912 F.2d at 1223 (internal quotations omitted).

In United States v. McMahon, 715 F.2d 498 (11th Cir. 1983), the defendants contended that

the United States' failure to produce psychiatric reports regarding the United States' key witness to

them was in violation of Brady v. Maryland.  See 715 F.2d at 501.  The United States Court of

Appeals for the Eleventh Circuit noted that the United States did not have copies of the reports in

its case files and the trial judge decided to proceed to trial rather than wait until the defendants

obtained copies of the reports.  See 715 F.2d at 501.  The Eleventh Circuit stated that, even assuming

that the reports were favorable, they would not have been material, because the defendants "had an

ample opportunity to attack the credibility of [the witness'] testimony, and there [was] no indication in the record that this attack would have been strengthened if [the defendants] had been given copies of the psychiatric reports they sought." 715 F.2d at 501. The Eleventh Circuit noted that the defendants did not exercise reasonable diligence, because they could have contacted the doctors who prepared the reports, obtained any relevant information, or called the doctors as witnesses. See 715 F.2d at 501.

In Wilson v. Mitchell, 498 F.3d 491 (6th Cir. 2007), the United States Court of Appeals for the Sixth Circuit rejected the defendant's contention that the prosecution's failure to disclose the defendant's records from the Ohio Department of Youth Services was a violation under Brady v. Maryland. See 498 F.3d at 512-13. The defendant contended that the records were material, because the defendant's psychological expert needed to use them in the mitigation phase of the trial to prepare for the defendant's psychological evaluation and mental-health assessment. See 498 F.3d at 512. The Sixth Circuit rejected the defendant's contention that the expert's testimony was unprepared and incompetent without the use of the records. See 498 F.3d at 512. The Sixth Circuit explained that, even if the prosecution had suppressed the records despite the defendant's requests, the defendant did not demonstrate that the records were material, because he could not demonstrate that timely disclosure would have altered the outcome of the proceeding. See 498 F.3d at 513. The expert's testimony indicated that he agreed with most of the undisclosed records and therefore the defendant could not establish how the expert's testimony would have been different if the records had been disclosed earlier, nor how disclosure would have altered the outcome of the penalty phase. See 498 F.3d at 513.

## ANALYSIS

The Court will deny J. Gould's motion for new trial. The United States suppressed the 2005

-15-

report, because it knew of the existence of the report but did not produce the report. Nevertheless, J. Gould has not demonstrated that the evidence was favorable to him or that the evidence was material.

## I.      THE PROSECUTION SUPPRESSED EVIDENCE.

J. Gould argues that the prosecution failed to failed to produce the 2005 psychological evaluation. The United States argues that it did not suppress the 2005 mental health evaluation, because "it is undisputed that [Mr.] Williams submitted the report in question to the Court for *in camera* inspection in advance of any disclosure to the defense, and that the Court declined to order that the report be disclosed." Opposition at 3. On the contrary, however, the Sealed Ex Parte Motion did not state that it submitted the report for an in camera inspection; instead, it requested an order authorizing release of the 2005 report to the attorneys for the United States in J. Gould's case, not to J. Gould and/or his attorney. The United States did not seek to disclose the report to J. Gould until February 26, 2008, after the trial. The Court was thus justified on September 14, 2006, when it asked Mr. Williams why he was submitting the motion ex parte.

A defendant seeking a new trial based on an alleged violation under Brady v. Maryland must demonstrate that the prosecution suppressed evidence. "The prosecution must only reveal information that it had in its possession or knowledge -- whether actual or constructive." United States v. Beers, 189 F.3d at 1304. As the Tenth Circuit explained in Smith v. Secretary of New Mexico Department of Corrections, "while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a Brady claim, such proof is by no means necessary." 50 F.3d at 824.

J. Gould filed his first Notice of Brady Requests on December 24, 2003. See Defendant Gould's Brady Requests, filed December 24, 2003 (Doc 22)("First Request"). J. Gould's counsel

sought medical, psychological, and legal records showing Verdin-Rendon's psychological diagnosis. See First Request ¶ 9, at 3. On March 14, 2007, J. Gould filed his Second Notice of Brady Requests. See Defendant John Gould's Second Notice of Brady Requests ¶ 9, at 3, filed March 14, 2007 (Doc. 267)("Second Request"). The Second Notice listed Verdin-Rendon's psychological records among a host of other material that J. Gould asserted that he had not received. See Second Request ¶ 9, at 3. J. Gould also filed a motion to dismiss for violations under Brady v. Maryland. See Defendant Gould's Motion to Dismiss for Brady Violations, filed March 14, 2007 (Doc. 270)("Motion to Dismiss"). In that motion, J. Gould argued that he had not received the material listed in his Second Request. See Motion to Dismiss ¶ 2, at 1. The 2005 evaluation was a psychological record, responsive to J. Gould's requests for materials under Brady v. Maryland.

The United States had actual knowledge of the existence of the report. When Mr. Williams moved the Court for an order authorizing the release of mental health information relating to Verdin-Rendon to the attorneys for the United States in Case No. CR 03-2274, Williams represented that he served the motion on the attorneys for the United States in Case No. CR 03-2274. Because, in requesting an order allowing disclosure of Verdin-Rendon's mental health information, the motion stated that Verdin-Rendon "was recently convicted of violation of 8 U.S.C. § 1326 . . . in *United States v. Ismael* Verdin-Rendon a/k/a Tampico I. Verdin, CR 05-2277 RB (D.N.M.)" and that "[i]n connection with the Reentry case . . . a mental competency evaluation was conducted," the United States had actual knowledge of the existence of this mental health information regarding Verdin-Rendon. The United States did not obtain or disclose the 2005 psychological evaluation until approximately one year after J. Gould's trial. The Court therefore finds that the prosecution suppressed the evidence. See Smith v. Sec'y Dep't of Corr., 50 F.3d at 824 (stating that "proof the prosecutor had actual knowledge of the existence of the evidence at issue [is] sufficient to establish

the suppression element of a Brady claim").

In its Opposition, the United States represents that it submitted the document for *in camera* review.  But the 2006 motion does not mention *in camera* review.  It merely seeks permission to give the attorney in Washington D.C. a copy of the report.  It did not seek permission to give the document to J. Gould or to his attorney.  All United States attorneys were aware of the report.  The Court inquired why the motion was filed ex parte, and Mr. Williams never responded.  The Court still does not know why the United States filed the motion ex parte, but served the motion on other United States attorneys.  The failure to produce the report on J. Gould thus lies with the United States.

## II.    J. GOULD HAS NOT DEMONSTRATED THAT THE EVIDENCE WAS FAVORABLE OR EXCULPATORY.

J. Gould asserts that he was at a tactical disadvantage in the decision whether to call Verdin-Rendon at trial, because the prosecution did not disclose the report.  J. Gould argues that Verdin-Rendon's testimony, if competent, was essential for his defense, because Verdin-Rendon could confirm that: (i) the correctional officers taunted him and caused the altercation; (ii) J. Gould used pepper spray on him, but his injuries were not from the pepper spray; and (iii) J. Gould did not smash his head into the concrete.  J. Gould also asserts that timely disclosure of the evaluation would have identified Dr. Sosa as a defense witness able to explain to the jury Verdin-Rendon's psychiatric condition.  The United States argues that the 2005 report is not exculpatory, because it does not "bear[] upon whether the defendant committed the acts charged, or upon the credibility of government witnesses who testify against the defendant."  Opposition at 4.

The evidence is question must be exculpatory or favorable to the defendant.  See Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825.  "Impeachment evidence is exculpatory for Brady

purposes." United States v. Smith, 534 F.3d 1211, 1222 (10th Cir. 2008). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." United States v. Buchanan, 891 F.2d 1436, 1443 (10th Cir. 1989).

Although impeachment evidence is exculpatory, the United States did not call Verdin-Rendon as a witness. Because Verdin-Rendon was not a witness, information going to his credibility was not discoverable under Giglio v. United States. See Giglio v. United States, 405 U.S. at 154-55. J. Gould therefore has not demonstrated that the 2005 report, to the extent that it goes to Verdin-Rendon's credibility, is exculpatory or favorable to him.

There was nothing about the Verdin-Rendon 2005 psychological report that was "obviously exculpatory." Smith v. Sec'y Dep't of Corr., 50 F.3d at 826-27. The psychological report does not have anything to do with whether J. Gould aided and abetted the assault of Verdin-Rendon. The report does not mention any statements that Verdin-Rendon made regarding the identity of his attackers or what they did. J. Gould has not articulated why the material is favorable to him. J. Gould's assertion that the 2005 psychological materials, in hindsight, may have led him to call Verdin-Rendon to testify on his behalf at trial does not demonstrate favorability. At most, the evidence might have helped him decide to call Verdin-Rendon. Although J. Gould contends that Verdin-Rendon would have given testimony favorable to him, there is no evidence that Verdin-Rendon would have given testimony favorable to J. Gould on the issues. Moreover, although J. Gould argues that disclosure of the report would have identified Dr. Sosa as a defense witness able to explain Verdin-Rendon's psychological condition, there is no evidence that Dr. Sosa would have given testimony favorable to J. Gould.[2] In sum, J. Gould has not proved, by a preponderance of the

---

[2] In its Jan. 2, 2008 MOO, the Court found that the 2003 report did not contain favorable evidence, but noted that, although Verdin-Rendon did not testify at trial, much of the information

evidence, that the psychological evaluation is favorable to him.

### III.   J. GOULD HAS NOT DEMONSTRATED THAT THE EVIDENCE WAS MATERIAL.

J. Gould argues that the psychological report would have helped him decide whether to call Verdin-Rendon at trial.  He argues that Verdin-Rendon's testimony was essential to his defense, because he could confirm that: (i) the correctional officers taunted him and caused the altercation; (i) J. Gould used pepper spray on him but that the injuries he suffered were not from pepper spray but from officers "stomping down on his limbs;" and (iii) J. Gould did not smash Verdin-Rendon's head into the concrete.  Second Motion for New Trial at 2.

The United States argues that "any relationship between the mental health evaluation and [J.] Gould's failure to call Verdin-Rendon as a witness at trial was not 'material' because it cannot be said that Verdin-Rendon's testimony was reasonably likely to change the outcome of the trial." Opposition at 6.  The United States argues that "[J.] Gould's argument for materiality relies on multiple levels of speculation, namely that Verdin-Rendon would have said anything favorable to [J.] Gould (even though there is no record that Verdin-Rendon has ever said anything favorable to [J.] Gould), and that the jury would believe him if he had."  Opposition at 6 (internal citation omitted).

J. Gould is not arguing that the 2005 evaluation itself would have affected the verdict. Instead, he is arguing that the evaluation would have helped him decide whether to call Verdin-Rendon, and how to "get past Mr. Verdin[-Rendon]'s obstinacy."  Second Motion for New Trial at

---

in the 2003 report was elicited at trial, such as a characterization of Verdin-Rendon as child-like and slow.  See Jan. 2, 2008 MOO at 40.  The 2005 report contains less information than the 2003 report regarding how the evaluator induced Verdin-Rendon to speak and the injustices that Verdin-Rendon discussed.

1, 3.

The documents in question were not material in J. Gould's defense. While J. Gould states that Verdin-Rendon's psychological report would have been a blueprint on how to speak with Verdin-Rendon, and would have helped him determine whether to call Verdin-Rendon, his counsel's interaction with Verdin-Rendon illustrates the immateriality of the disputed documents. J. Gould and his counsel saw Verdin-Rendon on September 29, 2006, when the United States arranged for J. Gould to take Verdin-Rendon's deposition. See MOO at 39-40. On that occasion, Verdin-Rendon was non-communicative and refused to answer questions from J. Gould's counsel. See MOO at 39-40. Based on this encounter in September 2006, J. Gould most likely had more insight into how Verdin-Rendon was likely to testify than he could have obtained from a written report created in 2005. The 2005 report did not contain insight on how to obtain information from Verdin-Rendon in an interview setting. The 2005 report solely states that, at first, Verdin-Rendon refused to sign the necessary forms and that, eventually, he agreed to proceed. The 2005 report does not set forth a blueprint to getting Verdin-Rendon to speak. After Verdin-Rendon refused to submit to a deposition, J. Gould did not make any effort to compel Verdin-Rendon's testimony. The most reasonable conclusion that can be drawn from J. Gould's failure to pursue Verdin-Rendon as a witness at trial is that J. Gould's personal observations convinced him not to call Verdin-Rendon as a witness at trial.

Unable to argue that the 2005 report itself would have changed the result of the trial, J. Gould contends that the report would have helped him decide whether to call Verdin-Rendon at trial. J. Gould speculates that, if he had been privy to the 2005 report, the information would have enabled him to call Verdin-Rendon as a cooperative witness at trial. Speculation aside, nothing in the 2005 report suggests a means of improving Verdin-Rendon's condition such that he might have become

a cooperative witness at trial.  J. Gould asserts that the "evaluation provided a blueprint on how to get past . . . Verdin[-Rendon]'s obstinacy including offering an apology and commiserating with the wrongs which . . . Verdin[-Rendon] had done to him."  Second Motion for New Trial at 1.  The Court is unable to find a blueprint in the evaluation on how to get past Verdin-Rendon's obstinacy. The Court did not find a reference to an apology or commiseration of wrongs in the report.[3]  Verdin-Rendon met with Dr. Sosa twice.  The first time, Verdin-Rendon would not consent to Dr. Sosa conducting a psychological evaluation, and became upset and agitated.  The second time, Verdin-Rendon again refused to sign the necessary forms for a period of time.  Verdin-Rendon eventually agreed to proceed, and after signing all the forms, he became pleasant and cooperative.  The Court has found nothing in the report which suggests a blueprint of how to get Verdin-Rendon to cooperate.  Moreover, it is possible that J. Gould's counsel could have replicated in the courtroom what Dr. Sosa did in the examination, but it is also possible that the courtroom scene could have resembled the September 2006 interview attempt.  Dr. Sosa recognized that Verdin-Rendon is "expected to have an extremely negative response to future court proceedings."  PER at 5.  In any case, J. Gould does not adequately explain how his ability to more effectively question Verdin-Rendon would have resulted in him calling Verdin-Rendon and in a "probability sufficient to undermine confidence in the outcome" of his trial.  United States v. Velarde, 485 F.3d at 559.

Moreover, although J. Gould has represented that the report would have helped him

---

[3] J. Gould's reference to an apology or commiseration of wrongs might be to the 2003 report, but not accurately to the 2005 report.  The 2003 report discusses how Verdin-Rendon was guarded and agitated, and refused to tell Abraham Fiszbein, M.D. about the injustices he had suffered, despite encouragement, until Dr. Fiszbein told Verdin-Rendon that he had been born in Argentina, which elicited an "unexpected positive reaction in him," because he was comfortable speaking to someone from a "Hispanic" country and who spoke Spanish.  Comprehensive Psychiatric Evaluation, filed May 10, 2007 (Doc. 353-1).

determine whether to call Verdin-Rendon, J. Gould has not established that he would have called Verdin-Rendon as a witness if he knew the contents of the report.[4] Even if disclosure of the 2005 report would have helped J. Gould decide whether to call Verdin-Rendon, J. Gould's assertions that Verdin-Rendon would have given evidence favorable and essential to his defense are speculative. Verdin-Rendon could have proved uncooperative and refused to answer questions from J. Gould's counsel as he did in the 2006 meeting. Even if the United States had disclosed the report, and J. Gould had decided to call Verdin-Rendon as a witness, despite his prior refusal to answer questions, "there [i]s no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different and there [i]s no such probability sufficient to undermine confidence in the outcome." Coleman v. Saffle, 912 F.2d at 1223 (internal quotation marks and citation omitted). See Salazar v. Hesse, 72 F.3d 138, at *2 (10th Cir. 1995)("We conclude that what [the defendant's main alibi witness] might have said if she had been questioned about the conversation is too speculative to undermine confidence in the outcome of the trial."). The Court therefore finds that J. Gould has not demonstrated, by a preponderance of the evidence, that the evidence was material.

**IT IS ORDERED** that Defendant John Gould's Sealed Motion to Supplement Motion for New Trial, filed May 6, 2009 (Doc. 433) is denied.

---

[4] J. Gould's counsel has represented that he would have "[d]efinitely" called Verdin-Rendon, had he had the 2003 report, because he could obtained a Spanish speaking lawyer to examine Verdin-Rendon. See Transcript of Hearing at 29:18-30:5 (taken October 12, 2007)(Aarons)("Tr."). Although J. Gould's counsel made this representation, the Court found in its Jan. 2, 2008 opinion that J. Gould was still unable to articulate why the psychological documents would have enabled J. Gould to call Verdin-Rendon as a witness in his defense. J. Gould's counsel has not made a representation that he definitely would have called Verdin-Rendon had he had the 2005 report. Given the lack of helpful contents in the 2005 report, it is unlikely that he would be able to make such a definitive statement for the 2005 report.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
    United States Attorney
Paul Spiers
    Assistant United States Attorney
Albuquerque, New Mexico

-- and --

J. Evans Rice III
Mark Blumberg
Kristy Parker
    Trial Attorneys
United States Department of Justice
Civil Rights Division, Criminal Section
Washington, D.C.

       *Attorneys for the Plaintiff*

Stephen Aarons
Santa Fe, New Mexico

       *Attorney for the Defendant*